## The Railroad Tax Cases.

### County of San Mateo *v.* Southern Pacific R. Co.

*(Circuit Court, D. California.* September 25, 1882.)

1. CONSTITUTIONAL LAWS—EQUAL PROTECTION OF THE LAWS—TAXATION.

   The fourteenth amendment of the constitution, in declaring that no state shall deny to any person within its jurisdiction the "equal protection of the laws," imposes a limitation upon the exercise of all the powers of the state which can touch the individual or his property, including among them that of taxation.

2. SAME—BURDENS TO BE EQUALLY IMPOSED—UNEQUAL TAXATION INHIBITED.

   The "equal protection of the laws" to any one implies not only that he has a right to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs, and the enforcement of contracts, but also that he is exempt from any greater burdens or charges than such as are equally imposed upon all others under like circumstances. This equal protection forbids unequal exactions of any kind, and among them that of unequal taxation.

3. SAME—UNIFORMITY IN TAXATION—RULE OF, CONSTRUED.

   Uniformity in taxation requires uniformity in the mode of assessment as well as in the rate of percentage charged.

4. SAME—RULE APPLIES TO ARTIFICIAL AS WELL AS NATURAL PERSONS.

   By the thirteenth article of the constitution of California, "a mortgage, deed of trust, contract, or other obligation by which a debt is secured, is treated, for the purposes of assessment and taxation, as an interest in the property affected thereby;" and, "except as to railroad and other *quasi* public corporations," the value of the property affected, less the value of the security, is to be assessed and taxed to its owner, and the value of the security is to be assessed and taxed to its holder. Section 4. But by the same article "the franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county" are

to be assessed at their actual value, and apportioned to the counties, cities, and districts in which the roads are located, in proportion to the number of miles of railway laid therein, no deduction from this value being allowed for any mortgages on the property. *Held*, that in the different modes thus prescribed of assessing the value of the property of natural persons and the property of railroad corporations as the basis of taxation, there is a departure from the rule of equality and uniformity.

5. SAME — CORPORATIONS — AS PERSONS — RIGHTS UNDER FOURTEENTH AMENDMENT.

Private corporations are persons, within the meaning of the first section of the fourteenth amendment, and are entitled, so far as their property is concerned, to the equal protection of the laws.

6. SAME — CONFLICT OF LAW — CONSTITUTIONAL GUARANTY.

Neither the constitution nor the laws of California relating to the assessment of railroads operated in more than one county provide for notice to the owner, or an opportunity for him to be heard at any stage of the proceeding. In this respect both conflict with the guaranty that no one shall be deprived of his property without due process of law.

7. SAME — PROTECTION OF PROPERTY RIGHTS — DUE PROCESS OF LAW.

Whatever the character of the proceeding by which one is deprived of his property, whether judicial or administrative, and whether it takes the property directly, or creates a charge or liability which may be the basis of taking it, the law directing the proceeding must provide for some kind of notice, and offer to the owner an opportunity to be heard, or the proceeding will want the essential ingredient of due process of law.

8. SAME — REVENUE AND TAXATION — STATE CONSTITUTION — CONSTRUCTION.

The provisions of article 13 of the constitution of California, treating of revenue and taxation, are not conditions upon the continued existence of railroad corporations.

9. SAME — CORPORATION — PROTECTION OF PROPERTY GUARANTIED.

The state possesses no power to withdraw corporations from the guaranties of the federal constitution. Whatever property a corporation lawfully acquires is held under the same guaranties which protect the property of natual persons from spoliation.

10. SAME — STATE POWER OVER CORPORATIONS — VESTED RIGHTS.

Under the reserved power to amend, alter, or repeal the laws under which private corporations are formed, the state cannot exercise a control over the property of a corporation, except such as may be exercised through control over its franchise, and over like property of natural persons engaged in similar business. It cannot divest property or rights which have become vested.

11. STATE STATUTE — PASSAGE OF BILLS — JUDICIAL INQUIRY.

The constitution of California (Section 15, art. 4) provides that " on the final passage of all bills they shall be read at length, and the vote shall be by yeas and nays upon each bill separately, and shall be entered on the journal; and no bill shall become a law without the concurrence of a majority of the members elected to each house." Under this provision the court, to inform itself, will look to the journals of the legislature. and if it appear therefrom that the bill did not pass by the constitutional majority, then it will not be regarded as a law. SAWYER, J.

12. SAME — JOURNALS OF LEGISLATURE AS EVIDENCE.

The journals of the legislature show that the act of March 14, 1881, mentioned in the opinion, never became a law. SAWYER, J.

This was an action commenced by the county of San Mateo, of California, under the provisions of an act of the state of 1880, (St. 1880, p. 136,) for the recovery of state and county taxes claimed to be due from the defendant to the plaintiff for the fiscal year 1881–1882. The complaint is in the form prescribed by the statute. The amended answer contains a general denial of every allegation of the complaint, and sets up special matters as a defense. With this general denial the court does not deal; it deals only with the special matters pleaded, it having been agreed by counsel that if they constitute a defense to the action judgment final shall be entered for the defendant, otherwise for the plaintiff.

The material averments of the answer in this respect are that the defendant is a corporation existing under the laws of the United States and of the state of California, having its principal place of business in the city and county of San Francisco; that it was organized in the year 1878 under an act of the legislature of the state entitled "An act to provide for the incorporation of railroad companies, the management of the affairs thereof, and other matters relating thereto," approved May 30, 1861; that the term of its existence was to be 50 years from the date of its organization; that it is still in existence under said laws, except in so far as its existence and character are affected by the federal enactments referred to and made part of the answer; that many of its stockholders and members now are and ever have been citizens of the United States, residents of the state of California, while many other stockholders and members are citizens of the United States, and residents of states other than the state of California; that it constructed a line of railroad known as the Southern Pacific Railroad, which commences at the city of San Francisco, and extends in a southerly direction to connect with the Texas & Pacific Railroad, and the Atlantic & Pacific Railroad, both of which are chartered by act of congress; that prior to the first day of January, 1881, it was indebted to divers persons, citizens of the United States, many of them citizens and residents of the state of California, in large sums of money, which were advanced for, and used in the construction and equipment of, the defendant's railroad; that to secure the payment of such indebtedness the company, prior to the first day of January, 1881, executed and delivered a mortgage upon its railroad, rolling stock, appurtenances, and franchise, and upon divers tracts of land belonging to it, and situated in different parts of the state; that the indebtedness so secured exceeds $3,000 per mile,

and is still subsisting, secured as aforesaid, no part thereof having been paid except its accruing interest.

It is further averred that the assessment, according to which the taxes claimed were levied, was made on the second day of May, 1881, by the board of equalization of the state of California; that the board assessed against the defendant the whole of its railroad property, and failed to deduct from its value the mortgage given thereupon to secure said indebtedness; that the assessment was made without notice to the defendant, and that neither the constitution nor the laws of the state of California provided in respect to such assessment an opportunity of time, place, or tribunal for the defendant to be heard, or for any notice to the defendant before its liability was fixed; that all owners of railroad property situated in said state, and operated in more than one county, as is the property of the defendant, are denied any protection from the laws of California, which require with respect to other property that notice of its assessment shall be given to the owners; which require that before its liability shall be fixed an opportunity to be heard shall be afforded to them; which give to them an appeal from the assessor to a board of equalization; which require the assessment to be made in the counties in which the property is situated, and prevent its being made in localities distant from the *situs* of the property; and which allow deductions from its valuation for indebtedness secured by mortgage.

It is further averred that at and before and ever since the adoption of the constitution of California now in force, there were and have been existing, under the laws of said state, corporations of various kinds, formed for the purpose of, and actually operating and doing business, and holding and using property in more than one county in the state; that at all said times there were, and there are now, divers natural persons, residents of said state, operating property in more than one county; that at all of said times there were, and now are, railroads owned by corporations formed under the general laws of said state which are operated only in one county; that by the provisions of section 10, art. 13, of the state constitution persons operating railroads in more than one county in the state have been singled out from other persons operating property in more than one county in the state, and denied the right common to all other persons to apply for relief from overvaluation of their property by the assessor to local boards of equalization, and denied the rights and privileges accorded by law to all other persons in that respect.

It is further averred that the franchise of defendant is held, and its corporate powers exercised, under authority of the government of the United States; that by the several acts of congress set out in the answer the defendant was selected by the government of the United States as a means and instrument of that government to construct the railroad in question, and to keep and maintain the same in repair, to the end that the government of the United States might, when occasion required, use the same for the transportation of its armies, military stores, and mails, and for such other purposes as said government, in the exercises of its powers, might desire to use the same; that the government of the United States has never given to the state of California the right to lay any tax on the franchise, existence, or operation of defendant; that such a tax would hinder and impede the lawful operations of the government of the United States, and would hinder, delay, and prevent the defendant from performing the obligation imposed upon it by said act of congress, and would wholly nullify and prevent the enforcement of the same; and that in the assessment, which constitutes the basis of plaintiff's action, the valuation of the franchise of the defendant—its right to exist—is so blended with the valuations affixed to the road-way, road-bed, rails, and rolling stock, that it can neither be distinguished nor separated from them.

Upon the matters thus averred, it was alleged and claimed by the defendant that in the assessment of its property, according to which the taxes in suit were levied, an unlawful and unjust discrimination was made between its property and the property of individuals to its disadvantage, in that it was not allowed any deduction from the valuation of its property for the mortgage thereon, which is allowed for mortgages in the assessment of property of individuals; and that the company was thus subjected to an unequal share of the public burdens; and that, as this discrimination was made in pursuance of provisions of the constitution of the state, the company was denied the equal protection of the laws guarantied by the fourteenth amendment of the federal constitution.

It was further alleged and claimed by the defendant that the assessment of its property was illegal and void, because made in pursuance of the provisions of the state constitution, which gave no notice to the defendant, and afforded it no opportunity to be heard respecting the value of its property, or for the correction of any errors of the state board, thus depriving it of its property without due process of law guarantied by that amendment.

It was also averred and claimed that the franchise of the defendant was exempt from state taxation, the defendant having been selected by the government of the United States as a means and instrument to construct the road, and to keep the same in repair, for the transportation of the troops, military stores, and mails of the United States, and for such other purposes as the government, in the exercise of its powers, might desire.

The case was argued before Mr. Justice FIELD and Judge SAWYER, the argument commencing on the twenty-first day of August, 1882, and closing on the 29th. The opinions were read in the circuit court on September 25, 1882.

*A. L. Rhodes, A. L. Hart,* Atty. Gen., and *Tolles* and *Ware,* Dist. Attys., for plaintiff.

*Creed Haymond, J. Norton Pomeroy, T. I. Bergin,* and *T. B. Bishop,* for defendants.

FIELD, Justice. This action is brought to recover of the Southern Pacific Railroad Company, a corporation formed under the laws of California, certain state and county taxes levied upon its property for the fiscal year of 1881 and 1882, alleged to be due to the plaintiff, with 5 per cent. added for their non-payment, and interest. It was commenced in one of the superior courts of the state, and, on application of the defendant, was removed to this court.

The railroad company, besides a general denial of the allegations of the complaint, sets up as a special answer to the action that in the assessment of its property, according to which the taxes claimed were levied, an unlawful and unjust discrimination was made between its property and the property of individuals, to its disadvantage, subjecting it to an unequal share of the public burdens, and that it was not afforded an opportunity of being heard respecting the assessment, and that such discrimination was made and proceeding had under the provisions of the constitution of California, adopted in 1879, which in that respect are in conflict with the fourteenth amendment of the constitution of the United States.

By the constitution of California, all property in the state, not exempt under the laws of the United States, is, with certain exceptions, to be taxed in proportion to its value, to be ascertained as prescribed by law; but in the ascertainment of its value as a basis for taxation, a distinction is made between the property owned by individuals and that owned by railroad corporations. By the thirteenth article, "a mortgage, deed of trust, contract, or other obligation by which a debt is secured," is treated, for the purposes of assessment and taxa-

tion, "as an interest in the property affected thereby," and, "except as to railroad and other *quasi* public corporations," the value of the property affected, less the value of the security, is to be assessed and taxed to its owner, and the value of the security is to be assessed and taxed to its holder. Section 4. But by the same article "the franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county" are to be assessed at their actual value, and apportioned to the counties, cities, and districts in which the roads are located in proportion to the number of miles of railway laid therein. No deduction from this value is allowed for any mortgages on the property.

By the constitution there is also a different system of assessment provided for "the franchise, road-way, road-bed, rails, and rolling stock" of railroads operated in more than one county from that provided for other property. The assessment of other property is to be made in the county, city, or district in which it is situated in the manner prescribed by law; and the supervisors of each county constitute a board of equalization of the taxable property of the county, and must act upon prescribed rules of notice to its owners. A state board of equalization is also created to equalize the valuation of the taxable property of the several counties, so that equality may be preserved between the tax-payers of the different localities, and its action in this respect must likewise be upon prescribed rules of notice.

The assessment of the franchise, road-way, road-bed, rails, and rolling stock of railroads operated in more than one county in the state is to be made by this state board. And in making it, the board is not required to give any notice to the owners, nor is any provision made for affording them an opportunity to be heard respecting the valuation of their property. The tenth section of the article which confers this power of assessment has been held by the supreme court of the state to be self-executing, requiring no legislation for its enforcement.

The defendant, as already stated, is a corporation formed under the laws of the state, and operates a railroad through several counties. The entire length of its road in the state is a little over 711 miles, of which twenty-five miles and one-tenth of a mile pass through the county of San Mateo. Its principal place of business is at San Francisco. Its stockholders are, and always have been, citizens of the United States, some of whom are residents of this state, and some of other states. Previously to January 1, 1881, it was indebted to different citizens of the United States, many of them residents of this

state, in large sums, advanced to construct and equip the road; and to secure this indebtedness it executed, prior to that date, a mortgage upon its road, its franchise, and its rolling stock and appurtenances, and also upon a large number of tracts of land situated in different counties. The indebtedness secured exceeds $3,000 a mile of the road, no part of which, except the accruing interest, has been paid; the whole remains a valid and subsisting obligation of the company.

In the fiscal year of 1881 and 1882, the state board of equalization assessed the franchise, road-way, road-bed, rails, and rolling stock of the defendant at $11,739,915,—that is, at the rate of $16,500 per mile,—and apportioned to the county of San Mateo $414,150. Upon the amount thus apportioned the taxes were levied for which the present action is brought. In the assessment no deduction was allowed for the mortgage, but the property was assessed at its entire value independently of the mortgage. Nor was any notice given to the company by the board of its action, nor was any opportunity allowed the company to be heard respecting the assessment. These facts are admitted by the demurrer, and the validity of the defense rests upon the application of the law to them.

The railroad company contends that the taxes are invalid and void on two grounds:

(1) Because the assessment, according to which they were levied, was made in pursuance of the discriminating provisions of the state constitution, in the enforcement of which the company was not allowed any deduction from the valuation of its property for the mortgage thereon, and was thus subjected to an unjust proportion of the public burdens, and denied the equal protection of the laws guarantied by the fourteenth amendment of the federal constitution; and (2) because the assessment was made in pursuance of provisions of the state constitution, which gave no notice to the company, and afforded it no opportunity to be heard respecting the value of the property, or for the correction of any errors of the board, thus depriving it of its property without due process of law guarantied by that amendment.

The plaintiff, on the other hand, contends:

(1) That the power of taxation possessed by the state is unlimited, except by the constitution of the United States, and that its exercise cannot be assailed in a federal court, either for the hardship or injustice of the tax levied; (2) that the classification of property for taxation, and the apportionment of taxes according to such classification, are not forbidden by the constitution of the United States, and that within this principle the taxes on the property of the railroad company were lawfully imposed; (3) that the fourteenth amendment of the constitution of the United States was adopted to protect the newly-made citizens of the African race in their freedom, and

should not be extended beyond that purpose; (4) that corporations are not persons within the meaning of that amendment; (5) that the statute fixing the sessions of the state board of equalization, and requiring a statement in writing from the defendant of the amount and value of its property, afforded all the notice and hearing essential to the validity of the assessment made; and (6) that the provisions of article 13 of the constitution, as to the taxation of railroad property, are to be treated as conditions upon the continued existence of railroad corporations.

We do not state the positions of the several counsel who argued the case in their precise language, for they were presented in various forms, but we give their substance and purport.

The questions thus presented for our determination are of the greatest magnitude and importance. The answer to them concerns not merely the railroad corporations of this state, but all corporations other than municipal within the United States. It is of the highest interest to them all to know whether their property is subject to the same rules of assessment and taxation to which the property of individuals is subject, or whether it can be separated and distinguished from that of individuals and made liable to such different burdens in the way of taxation as the state may choose to impose. The questions have been argued with great ability and learning by distinguished counsel on both sides, and they have received from the court the most patient and thoughtful examination. Indeed, their examination has been accompanied with a painful anxiety to reach a right conclusion, aware as the court is of the opinion prevailing throughout the community that the railroad corporations of the state, by means of their great wealth and the numbers in their employ, have become so powerful as to be disturbing influences in the administration of the laws; an opinion which will be materially strengthened by a decision temporarily relieving any one of them from its just proportion of the public burdens. That consideration, however, cannot be allowed to affect the judgment of the court. Whatever acts may be imputed justly or unjustly to the corporations, they are entitled when they enter the tribunals of the nation to have the same justice meted out to them which is meted out to the humblest citizen. There cannot be one law for them and another law for others.

It is undoubtedly true that the power of taxation possessed by the state may be exercised upon any subject within her jurisdiction, and to any extent not prohibited by the constitution of the United States. As stated by the supreme court: "It may touch property in every shape,—in its natural condition, in its manufactured form, and in its various transmutations. And the amount of the taxation may be de-

termined by the value of the property, or its use, or its capacity, or its productiveness. It may touch business in the almost infinite forms in which it is conducted,—in professions, in commerce, in manufactures, and in transportation. Unless restrained by provisions of the federal constitution, the power of the state as to the mode, form, and extent of taxation is unlimited where the subjects to which it applies are within her jurisdiction." *State Tax on Foreign-held Bonds*, 15 Wall. 319.

It is also undoubtedly true that the hardship and injustice of a tax levied by the state, considered with reference to its amount, are not subjects of federal cognizance. Whether a tax upon property, subject to taxation, be 1 per cent. of its value, or 10 per cent., or 20, or more, is a mere matter of state discretion; a question of policy and not of power. So we often find in the reports language to the effect that the state's power of taxation is without limitation; language which may be correct when applied to the special facts of the cases in which it is used, but which should always be read with a reservation that the exercise of the power does not conflict with any of the inhibitions of the federal constitution.

There are in the very nature of the federal government, and the powers with which it is clothed, many prohibitions upon the taxing power of the states. Within the sphere of its action that government is supreme, and no impediment to the free and full exercise of its power is permissible. The state cannot, therefore, place any restrictions upon the agencies of the federal government; otherwise it might embarrass and even defeat the operations of that government. It was long ago said by Chief Justice Marshall that the power to tax involves the power to destroy; and that there would be a manifest repugnance in allowing one government to control the constitutional measures of another government in respect to which the latter is declared to be supreme. When, therefore, congress had created a bank of the United States as an agency in the management of the finances of the government, it was held that the states were inhibited from taxing the institution.

"If the states," said that great judge, "may tax one instrument employed by the government in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government to an excess which would defeat all the ends of government. This was not intended by the American people. They did not design to make their government dependent on the states." *McCullough* v. *Maryland*, 4 Wheat. 432.

For like reasons the public securities of the United States are exempt from taxation by the states, except so far as such taxation is permitted by congress. A tax imposed by the city of Charleston upon all personal estate in its limits, including among other things stock of the United States, was therefore adjudged to be invalid. The court said that the tax was upon a contract between the government and individuals, and therefore operated directly upon the power to borrow money on the credit of the United States; that if the right to impose it existed with the states, it was a right which in its nature acknowledged no limits, and might be exercised to an extent which would seriously embarrass the government. Its existence was therefore held inconsistent with the supremacy of the government in the exercise of its granted powers. *Weston* v. *Charleston*, 2 Pet. 449.

Other illustrations might be given of implied inhibitions of the federal constitution to taxation by the states. The powers of the general government cannot be interfered with, or their exercise embarrassed in any respect, by such taxation; as has often been held with reference to attempted taxation on goods imported, while retaining the character of imports in unbroken packages, and on goods in transit from one state to another. The power to regulate commerce, foreign and interstate, cannot be thus trammeled by state action. *Brown* v. *Maryland*, 12 Wheat. 434; *Welton* v. *State*, 100 U. S. 275; *Webber* v. *Virginia*, 103 U. S. 344.

So in regard to the express prohibitions upon the states contained in the federal constitution; they apply equally to taxation and to any other action of the state. They cannot be evaded under the plea that the state possesses the unrestricted power to tax. Where, for example, a state has stipulated for a valid consideration to exempt certain property from taxation, as it has been repeatedly held that it may do, the stipulation cannot subsequently be withdrawn, and the property subjected to taxation. The provision which secures the inviolability of contracts against state legislation stands as a perpetual interdict against the imposition of the charge. It is to no purpose in such case to speak of the power of taxation as an attribute of state sovereignty which cannot be surrendered; that sovereignty, whatever its extent, must be exerted in subordination to the prohibition of the constitution, which is the supreme law of the land. Many of the attributes of sovereignty which the states would possess if independent political communities, have been in like manner surrendered to the federal government, such as the power to declare war, to make peace, to enter into treaties of alliance, and to regulate commerce

with foreign nations. The question in all cases presented to a federal court, where complaint is made of a tax levied by the states, is whether there is any inhibition, express or implied, in the constitution of the United States upon the imposition of the tax. If there be, it is the duty of the court to enforce the inhibition, it matters not whom its decision may affect, nor how great and irresponsible the power of the state may be independently of such prohibition.

The fourteenth amendment to the constitution, in declaring that no state shall deny to any person within its jurisdiction the equal protection of the laws, imposes a limitation upon the exercise of all the powers of the state which can touch the individual or his property, including among them that of taxation. Whatever the state may do, it cannot deprive any one within its jurisdiction of the equal protection of the laws. And by equal protection of the laws is meant equal security under them to every one on similar terms,—in his life, his liberty, his property, and in the pursuit of happiness. It not only implies the right of each to resort, on the same terms with others, to the courts of the country for the security of his person and property, the prevention and redress of wrongs and the enforcement of contracts, but also his exemption from any greater burdens or charges than such as are equally imposed upon all others under like circumstances.

Unequal exactions in every form, or under any pretense, are absolutely forbidden; and of course unequal taxation, for it is in that form that oppressive burdens are usually laid. It is not possible to conceive of equal protection under any system of laws where arbitrary and unequal taxation is permissible; where different persons may be taxed on their property of the same kind, similarly situated, at different rates; where, for instance, one may be taxed at 1 per cent. on the value of his property, another at 2 or 5 per cent., or where one may be thus taxed according to his color, because he is white, or black, or brown, or yellow, or according to any other rule than that of a fixed rate proportionate to the value of his property.

In the constitution of several states a provision is found requiring "equality and uniformity" in the taxation of property, and this is held to mean that taxes must be levied according to some fixed rate or rule of apportionment, so that all persons shall pay the like amount upon similar kinds of property of the same value. As it seemed to one of the judges of the supreme court of Michigan:

"To compel individuals to contribute money or property to the use of the public without reference to any common ratio, and without requiring the sum paid by one piece or kind of property, or by one person, to bear any relation

whatever to that paid by another, is to levy a forced contribution, not a tax, duty, or impost, within the sense of these terms as applied to the exercise of powers by any enlightened or responsible government." *Woodbridge* v. *City of Detroit*, 8 Mich. 301; Burroughs, Taxation, c. 5.

Absolute equality and uniformity may not be attainable in practice, but an approximation to them is possible, and any plain departure from the rule will defeat the tax.

What is called for under a constitutional provision requiring equality and uniformity in the taxation of property must be equally called for by the fourteenth amendment. The forced contribution from one which would follow taxation of his property without reference to a common ratio, would be inconsistent with that equal protection which the amendment requires the state to extend to every person within its jurisdiction.

The application of the amendment to taxation has been recognized by the legislation of congress. Soon after the adoption of the constitutional amendment, abolishing slavery and involuntary servitude, measures were proposed to give practical freedom to the emancipated race, which resulted in the passage of the civil-rights act. This act gave citizenship to persons of that race, and then declared that citizens of the United States of every race and color, without regard to any previous condition of slavery or involuntary servitude, should have the same right in every state and territory to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, own, and convey real and personal property, and to the full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and should be subject to like punishments, pains, and penalties, and to none other. After the adoption of the fourteenth amendment, congress re-enacted this act, and to the clause that all persons within the jurisdiction of the United States should enjoy the same rights as white citizens, and be subject only to like punishments, pains, and penalties, it added, and subject only to like "*taxes, licenses, and exactions of every kind, and to no other.*" Rev. St. § 1977.

The adjudications as to the meaning of the rule of equality and uniformity to be observed in taxation, may, therefore, be properly referred to in construing the requirement of the fourteenth amendment, when it is invoked with respect to burdens imposed by taxation. In *Lexington* v. *McQuillan's Heirs* the supreme court of Kentucky said that the legislature of the state had no constitutional authority to exact from one citizen the entire revenue of the common-

wealth; and though the distinction between constitutional taxation and the taking of private property for public use by legislation might not be definable with perfect precision, the court was clearly of the opinion that whenever the property of a citizen was taken from him by the sovereign will and appropriated without his consent to the benefit of the public, the exaction could not be considered a tax unless similar contributions were made by the public itself, or rather exacted by the same public will from such constituent members of the same community as own the same kind of property; and that, though there may be a discrimination in the subjects of taxation, still persons of the same class, and property of the same kind, must generally be subjected alike to the same common burden. 9 Dana, (Ky.) 513.

In *State* v. *Township of Readington* the supreme court of New Jersey said:

" Taxation operates upon a community, or a class in a community, according to some rule of apportionment. When the amount levied upon individuals is determined without regard to the amount or value exacted from any other individual or classes of individuals, the power exercised is not that of taxation, but of eminent domain. A tax upon the persons or property of A., B., and C. individually, whether designated by name or in any other way, which is in excess of an equal apportionment among the persons, or property of the class of persons or kind of property subject to the taxation, is, to the extent of such excess, the taking of private property for a public use without compensation. The process is one of confiscation, and not of taxation." 36 N. J. Law, 70.

As the foundation of all just and equal taxation is the assessment of the property taxed,—that is, the ascertainment of its value,—in order that the tax may be levied according to some ratio to the value, uniformity of taxation necessarily requires uniformity in the mode of assessment as well as in the rate of taxation; or, to quote the language of the supreme court of Ohio expressing the same thought: "Uniformity in taxing implies equality in the burden of taxation, and this equality of burden cannot exist without uniformity in the mode of assessment as well as in the rate of taxation." *Exchange Bank of Columbus* v. *Hines*, 3 Ohio St. 1.

If we now look at the scheme of taxation prescribed by the constitution of California for the property of railroad companies, we shall perceive a flagrant departure from the rule of equality and uniformity so essential to equality in the distribution of the burdens of government. Whenever an individual holds property incumbered with a mortgage he is assessed at its value, after deducting

from it the amount of the mortgage. If a railroad company holds property subject to a mortgage, it is assessed at its full value, without any deduction for the mortgage; that is, as though the property were unincumbered. The inequality and discriminating character of the procedure will be apparent by an illustration given by counsel. Suppose a private person owns a farm which is valued at $100,000, and is incumbered with a mortgage amounting to $80,000: he is, in that case, assessed at $20,000; if the rate of taxation be 2 per cent. he would pay $400 taxes. If a railroad corporation owns an adjoining tract worth $100,000, which is also incumbered by a mortgage for $80,000, it would be assessed for $100,000, and be required to pay $2,000 taxes, or five times as much as the private person. There is here a discrimination too palpable and gross to be questioned, and such is the nature of the discrimination made against the Southern Pacific Railroad Company in the taxation of its property. Nothing can be clearer than that the rule of equality and uniformity is thus entirely disregarded.

The case of *People* v. *Weaver*, 100 U. S. 539, decided by the supreme court, respecting the taxation of shares of the national banks, may be cited in this connection. Without the permission of congress, the shares of these banks could not be taxed by the states. Congress gave the permission on condition that the taxation should not be at a greater rate than is assessed on other moneyed capital in the hands of individual citizens of the state, and that the shares owned by non-residents of the state should be taxed at the place where the bank is located. Rev. St. § 5219. In the case cited the court held, with regard to such taxation:

(1) That the prohibition imposed by congress against discrimination had reference to the entire process of assessment, and included the valuation of the shares as well as the rate of percentage charged; (2) that a statute of New York which established a mode of assessment by which such shares were valued higher in proportion to their real value than other moneyed capital, was in conflict with the prohibition, although the same percentage on such valuation was levied; and (3) that a statute which permitted a party to deduct his debts from the valuation of his personal property, except so much as consisted of those shares, taxed the shares at a greater rate than other moneyed capital.

The assessment thus held to be a discrimination against the shares of national banks in the taxation system of New York is similar to what we hold to be a discrimination against the property of railroad corporations in the taxation system of California.

In the case of the *Evansville Bank* v. *Britton*, decided at the last term of the supreme court, the doctrine of the *Weaver Case* was affirmed, and it was held that the taxation of shares in the national banks, under the revenue laws of Indiana, without permitting the shareholder to deduct from their assessed value the amount of his *bona fide* indebtedness, which was allowed in the case of other investments of moneyed capital, was a discrimination against the act of congress and illegal. 105 U. S. 322.

It is no answer to this discrimination to say that property in the state may be divided into classes, and different rates prescribed for them. Undoubtedly property may be classified for purposes of taxation. Real property may be subjected to one rate of taxation; personal property to another rate. Property in particular districts may be taxed for local purposes, while property elsewhere may be exempt. Taxation on business in the form of licenses may also vary according to the calling or occupation licensed, and the extent of business transacted, but even then there must be uniformity of charges with respect to the same calling or occupation in the same locality. It is, however, only with the taxation of property that we are concerned in this case, and the whole object of classifying property is that each class may be subjected to a special rate of taxation. There is no difference in the rate prescribed by the law of the state for the property of railroad corporations, and the rate prescribed for the property of individuals. There is only one rate for all property. There is, therefore, no case presented for the application of the doctrine of classification. The discrimination complained of arises from the different rule adopted in ascertaining the value of the property of railroad corporations as a basis for taxation, not from any different rate of taxation when the value is established. In all taxes upon property, whatever its form or nature, the property is taken as representing a pecuniary value; as standing for so much money invested. The tax is the rate per centum of this pecuniary value. The value being ascertained, the law fixes the rate. The ground of complaint here is that the law requires a higher value to be placed upon the defendant's property than upon the property of individuals similarly incumbered, or rather requires the assessor of the defendant's property, in estimating its value, to disregard and set aside certain elements materially affecting its amount, which are to be considered in estimating the value of the property of individuals. It is not classifying property to make this distinction in determining its value. It

is not classifying property to provide that the property of certain parties, which has a mortgage upon it, shall be assessed at its value after deducting the mortgage; and that the property of other parties, also having a mortgage upon it, shall be taxed at its full value without any deduction. That is not providing for a different rate of taxation for different kinds of property, but for unequal taxation according to the character of the owner.

Is the defendant, being a corporation, a person within the meaning of the fourteenth amendment, so as to be entitled, with respect to its property, to the equal protection of the laws? The learned counsel of the plaintiff, and the attorney general of the state, take the negative of this question, and assert with much earnestness that the amendment applies, and was intended to apply, only to the newly-made citizens of the African race, and should be limited to their protection.

It is undoubtedly true that the amendment had its origin in a purpose to secure to these newly-made citizens the full enjoyment of their freedom. When the amendment abolishing slavery and involitary servitude was adopted, there were men in congress who believed that it was intended to make every one born within the United States a freeman, and as such to give to him the right to pursue his happiness, in the ordinary vocations of life, subject to no restraint except such as affects others, and to enjoy equally with them the fruits of his labor. They therefore proposed the civil-rights bill, and secured its passage, the substantial provisions of which we have stated. Notwithstanding this expression of the national legislature as to the purpose of the amendment, the newly-made citizens were subjected in several of the states to various disabilities and burdens, and curtailed of their rights to such an extent that their freedom became of little value. To quote from the opinion of Mr. Justice Miller, speaking for the court, in the *Slaughter-house Cases*:

"They were in some states forbidden to appear in the towns in any other character than as menial servants. They were required to reside on and cultivate the soil without the right to purchase or own it. They were excluded from many occupations of gain and hire, and were not permitted to give testimony in the courts in any case where a white man was a party. It was said that their lives were at the mercy of bad men, either because the laws for their protection were inefficient, or were not enforced." 16 Wall. 70.

There was probably much exaggeration in what was reported of their treatment, but the statements made produced a profound impression upon congress. The validity of the civil-rights act was also

called in question, and in some instances was adjudged by state courts to be invalid. Reports also prevailed that loyal men of the south were treated with exceptional harshness, and that men from the north seeking residence there were met with marked hostility and aversion. It is not surprising that such was the fact, for notwithstanding the fiery courage and martial spirit of her people, their battalions had gone down before the forces of the Union. With the sound of the tread of the victorious army still ringing in their ears; with the desolations of war all around them, and the sudden rupture of their social relations by the emancipation of their former slaves,— it would have been a miracle if bitterness towards their recent foes had not lingered in their hearts and been exhibited in their conduct. A proud and brave people feel more keenly than others the sting of defeat. Undoubtedly much misconception and falsehood were mingled with the statements made respecting their action; nevertheless they led to the introduction into congress of the proposition for the fourteenth amendment. The discussion which followed, indicated that the purpose of its framers and advocates was to obviate objections to legislation similar to that contained in the first section of the civil-rights act, and to prevent for the future the possibility of any discriminating and hostile state legislation against any one.

Mr. Stevens, of the house of representatives, in presenting the proposition, after stating the provisions of the first section, said:

" I can hardly believe that any person can be found who will not admit that every one of these provisions is just. They are all asserted in some form or other in our declaration or organic law. But the constitution limits only the action of congress, and is not a limitation on the states. This amendment supplies that defect, and allows congress to correct the unjust legislation of the states so far *that the law which operates upon one man shall operate equally upon all.*"

In reply to an objection that the first section of the amendment was in substance the civil-rights bill, which congress had passed over the president's veto, and that by voting to so amend the constitution as to put the bill into it was to admit that the bill was unconstitutional, Mr. Garfield, then also a member of the house, said:

" We propose to lift that great and good law above the reach of political strife, beyond the reach of plots and machinations of any party, and fix it in the serene sky, in the eternal firmament of the constitution, where no storm of passion can shake it and no cloud can obscure it. For this reason, and not because I believe the civil-rights bill unconstitutional, I am glad to see that first section here."

Though the occasion of the amendment was the supposed denial of rights in some states to newly-made citizens of the African race, and the supposed hostility to Union men, the generality of the language used extends the protection of its provisions to persons of every race and condition against discriminating and hostile state action of any kind. Its effect in preserving free institutions, and preventing harsh and oppressive state legislation, can hardly be overstated. When burdens are placed upon particular classes or individuals, while the majority of the people are exempted, little heed may be paid to the complaints of those affected. Oppression thus becomes possible and lasting. But a burdensome law operating equally upon all will soon create a movement for its repeal. With the amendment enforced, a bad or an oppressive state law will not long be left on any statute book.

The argument that a limitation must be given to the scope of this amendment because of the circumstances of its origin is without force. Its authors, seeing how possible it was for the states to oppress without relief from the federal government, placed in the constitution an interdict upon their action which makes lasting oppression of any kind by them under the form of law impossible.

The amendment prohibiting slavery and involuntary servitude, except as a punishment for crime, had its origin in the previous existence of African slavery. But the generality of its language makes its prohibition apply to slavery of white men as well as that of black men; and also to serfage, vassalage, villenage, peonage, and every other form of compulsory labor to minister to the pleasure, caprice, vanity, or power of others.

The provision of the constitution prohibiting legislation by states impairing the obligation of contracts had its origin in the existence of tender laws, appraisement laws, stay laws, and installment laws passed by the states soon after the revolution, when their finances were embarrassed and their people were overwhelmed with debts. These laws, according to Story, prostrated all private credit and all private morals, and led to the adoption of the prohibition, by which such legislation was forever prevented. But in its construction the provision has not been limited to mere commercial contracts. In the *Dartmouth College Case* it was urged that the charter of the college was not a contract contemplated by the constitution, because no valuable consideration passed to the king as an equivalent for the grant, and that contracts merely voluntary were not

within the prohibition. But Chief Justice Marshall, after showing that the charter was a contract upon a valuable consideration, said:

"It is more than possible that the preservation of rights of this description was not particularly in view of the framers of the constitution when the clause under consideration was introduced into that instrument. It is probable that interferences of more frequent recurrence, to which the temptation was stronger and of which the mischief was more extensive, constituted the great motive for imposing this restriction on the state legislatures. But although a particular and a rare case may not in itself be of sufficient magnitude to induce a rule, yet it must be governed by the rule when established, unless some plain and strong reason for excluding it can be given." And again: "The case being within the words of the rule, must be within its operation likewise, unless there be something in the literal construction so obviously absurd or mischievous, or repugnant to the general spirit of the instrument, as to justify those who expound the constitution in making it an exception." 4 Wheat. 644.

Following that authority, we cannot adopt the narrow view for which counsel contend, and limit the application of the prohibition of the fourteenth amendment to legislation touching members of the enfranchised race. It has a much broader operation. It does not, indeed, place any limit upon the subjects in reference to which the states may legislate. It does not interfere with their police power. Upon every matter upon which previously to its adoption they could act, they may still act. They can legislate now, as they always could, to promote the health, good order, and peace of the community; to develop their resources, increase their industries, and advance their prosperity; but it does require that in all such legislation hostile and partial discrimination against any class or person shall be avoided; that the state shall impose no greater burdens upon any one than upon others of the community under like circumstances, nor deprive any one of rights which others similarly situated are allowed to enjoy. It forbids the state to lay its hand more heavily upon one than upon another, under like conditions. It stands in the constitution as a perpetual shield against all unequal and partial legislation by the states, and the injustice which follows from it, whether directed against the most humble or the most powerful; against the despised laborer from China, or the envied master of millions.

The adoption of the federal constitution met, as all know, with most determined opposition from a large class who believed that the exercise of the powers delegated to the general government would cripple and embarrass the states in the administration of their local

affairs. The dread of centralization disturbed the minds of some of the purest and greatest statesmen of the day. This feeling continued after the adoption of the constitution, and finally led to the first 10 amendments. The population of the country was sparse; each state afforded security to its people, and was to them the special object of attachment. They enjoyed under its laws protection in their property, in their homes, and in their business. They felt a natural distrust of a power wielded by officers not selected by themselves. They apprehended that the rights which they enjoyed might be encroached upon, if not destroyed. So the amendments proposed contained limitations upon the powers of congress, many of which were, indeed, unnecessary, but were adopted in order to prevent "misconception or abuse of the powers of the general government." They declared, among other things, that certain liberties should not be abridged, such as the free exercise of religion, the freedom of speech and of the press; that certain rights should not be taken away, such as the right of the people to peaceably assemble and petition for a redress of grievances, and to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures; that certain securities against wanton prosecution for public offenses should not be withdrawn, such as that no person should be held to answer for a felony except upon the presentment or an indictment of a grand jury; that in all prosecutions the accused should have the benefit of a speedy trial; should be informed of the nature and cause of the accusation; should be confronted with the witnesses against him; should have compulsory process for obtaining witnesses, and the assistance of counsel; that certain guaranties against oppression of person and spoliation of property should not be violated, such as afford protection against the deprivation of life, liberty, and property without due process of law, and the taking of private property by the public without compensation; that the enumeration in the constitution of certain rights should not be construed to deny or disparage others retained by the people; and that the powers not delegated to the United States by the constitution, nor prohibited by it to the states, were reserved to the states, respectively, or to the people. These were all restraints upon the general government. Had the population of the United States continued as sparse as when the constitution was formed, and the means of more rapid intercourse between the states had not been invented, it is possible that further amendments to the constitution would not have been demanded. But the immense development of the resources of the country, the

great increase of population, the constant intercourse between the states by steamer, railway, and telegraph, changed the business and commercial relations of the states to each other, and led the people of one section to seek a closer union, and to desire a greater authority to be exercised by the central government, while the peculiar institutions of the other section, and the different industries they developed, led its people to desire to limit, rather than to strengthen,. the central authority. Differences of opinion in matters of internal policy, and the estrangement engendered by controversies growing out of the existence of slavery in some of the states, ultimately culminated in civil war. Men then saw that danger was to be apprehended in a direction opposite to that which led to the original amendments. Restraints upon the power and action of the states were therefore suggested, and to impose them and to abolish slavery, the great cause of the civil conflict, the new amendments—the thirteenth, fourteenth, and fifteenth—were adopted.

" While, therefore," to quote the language of an admirable writer and eminent jurist, Judge Cooley, " the first amendments were for the purpose of keeping the central power within due limits, at a time when the tendency to centralization was alarming to many persons, the last were adopted. to impose new restraints on state sovereignty, at a time when state powers had nearly succeeded in destroying the national sovereignty. Of these amendments it may be safely affirmed that the first ten took from the Union no power it ought ever to have exercised, and that the last three required of the states the surrender of no power which any free government should ever employ."

It would tend, therefore, to defeat the great purposes of the late amendments, if to any of them we should give the narrow construction for which counsel contend.

Private corporations are, it is true, artificial persons, but with the exception of a sole corporation, with which we are not concerned, they consist of aggregations of individuals united for some legitimate business. In this state they are formed under general laws; and the Civil Code provides that they "may be formed for any purpose for which individuals may lawfully associate themselves." Any five or more persons may by voluntary association form themselves into a corporation. And, as a matter of fact, nearly all enterprises in this state, requiring for their execution an expenditure of large capital, are undertaken by corporations. They engage in commerce; they build and sail ships; they cover our navigable streams with steamers; they construct houses; they bring the products of earth and sea to market; they light our streets and buildings; they

open and work mines; they carry water into our cities; they build railroads, and cross mountains and deserts with them; they erect churches, colleges, lyceums, and theaters; they set up manufactories, and keep the spindle and shuttle in motion; they establish banks for savings; they insure against accidents on land and sea; they give policies on life; they make money exchanges with all parts of the world; they publish newspapers and books, and send news by lightning across the continent and under the ocean. Indeed, there is nothing which is lawful to be done to feed and clothe our people, to beautify and adorn their dwellings, to relieve the sick, to help the needy, and to enrich and ennoble humanity, which is not to a great extent done through the instrumentalities of corporations. There are over 500 corporations in this state; there are 30,000 in the United States, and the aggregate value of their property is several thousand millions.* It would be a most singular result if a constitutional provision intended for the protection of every person against partial and discriminating legislation by the states, should cease to exert such protection the moment the person becomes a member of a corporation. We cannot accept such a conclusion. On the contrary, we think that it is well established by numerous adjudications of the supreme court of the United States and of the several states, that whenever a provision of the constitution, or of a law, guaranties to persons the enjoyment of property, or affords to them means for its protection, or prohibits legislation injuriously affecting it, the benefits of the provision extend to corporations, and that the courts will always look beyond the name of the artificial being to the individuals whom it represents.

The case of the *Society for the Propagation of the Gospel in Foreign Parts* v. *Town of New Haven*, 8 Wheat. 464, furnishes an apt illustration of this doctrine. The sixth article of the treaty of peace with Great Britain of 1783 provided that there should be "no future confiscations made, nor any prosecutions commenced, against any person or persons for or by reason of the part which he or they may have taken in the present war, and that no person shall on that account suffer any future loss or damage, either in his person, liberty, or property." An English corporation claimed the benefit of this article with reference to certain lands in Vermont granted to it before the revolution, which the legislature of that state had undertaken to give to the

*Note. The number of corporations here stated is much less than the number actually existing. There are over 5,000 corporations in California alone.

town where they were situated. It was contended that the treaty only applied to natural persons; that it did not embrace corporations, because they were not persons who could take part in the war, or could be considered British subjects; but the position was held to be untenable. The court, speaking through Mr. Justice Washington, said that the argument proceeded upon an incorrect view of the subject, and referred to the case of *U. S.* v. *Devaux*, 5 Cranch, 86, to show that the court, when necessary, will look beyond the name of a corporation to reach and protect those whom it represents.

The constitution, in defining the judicial power of the United States, declares that it shall extend to "controversies between citizens of different states;" and in the case referred to by Mr. Justice Washington the question arose whether a corporation composed of citizens of one state could sue in the circuit court of the United States a citizen of another state, and it was held that it could. In deciding the question, the court, speaking through Chief Justice Marshall, said:

"However true the fact may be that the tribunals of the state will administer justice as impartially as those of the nation to parties of every description, it is not less true that the constitution itself either entertains apprehension on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and citizens, or between citizens of different states. Aliens or citizens of different states are not less susceptible of these apprehensions, nor can they be supposed to be less the objects of constitutional provision because they were allowed to sue by a corporate name. That name, indeed, cannot be an alien or a citizen, but the persons whom it represents may be the one or the other, and the controversy is, in fact and in law, between those persons suing in their corporate character, by their corporate names, for a corporate right, and the individual against whom the suit may be instituted. Substantially and essentially the parties in such a case, where the members of the corporation are aliens or citizens of a different state from the opposite party, come within the spirit and terms of the jurisdiction conferred by the constitution on the national tribunals. Such has been the universal understanding on the subject. Repeatedly has this court decided causes between a corporation and an individual without feeling a doubt respecting its jurisdiction."

The same point was presented in another form in the case of *Marshall* v. *Baltimore & O. R. Co.* 16 How. 326. There the question was whether a citizen of one state could sue in the circuit court of the United States a corporation of another state, and a similar conclusion was reached. After referring to the clause of the constitution extending the judicial power of the United States to controversies be-

tween citizens of different states, the court proceeded to consider the objections urged to treating a corporation as a citizen, so far as it might be necessary to protect the corporators:

"A corporation," observed Mr. Justice Grier, speaking for the court, "it is said, is an artificial person, a mere legal entity, invisible and intangible. This is no doubt metaphysically true in a certain sense. The inference, also, that such an artificial entity 'cannot be a citizen' is a logical conclusion from the premises, which cannot be denied. But a citizen who has made a contract, and has a controversy with a corporation, may also say, with equal truth, that he did not deal with a mere metaphysical abstraction, but with natural persons; that his writ has not been served on an imaginary entity, but on men and citizens; and that his contract was made with them as the legal representatives of numerous unknown associates, or secret and dormant partners.

"The necessities and conveniences of trade and business require that such numerous associates and stockholders should act by representation, and have the faculty of contracting, suing, and being sued in a ficititious or collective name. But these important faculties, conferred on them by state legislation, for their own convenience, cannot be wielded to deprive others of acknowledged rights. It is not reasonable that those who deal with such persons should be deprived of a valuable privilege by a syllogism, or rather sophism, which deals subtly with words and names, without regard to the things or persons they are used to represent."

The fifth amendment to the constitution declares that—

"No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; nor shall he be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use without just compensation."

From the nature of the prohibitions in this amendment it would seem, with the exception of the last one, as though they could apply only to natural persons. No others can be witnesses; no others can be twice put in jeopardy of life or limb, or compelled to be witnesses against themselves; and therefore it might be said with much force that the word "person," there used in connection with the prohibition against the deprivation of life, liberty, and property without due process of law, is in like manner limited to a natural person. But such has not been the construction of the courts. A similar provision is found in nearly all of the state constitutions; and everywhere, and at all times, and in all courts, it has been held, either by tacit assent or express adjudication, to extend, so far as their property is con-

cerned, to corporations. And this has been because the property of a corporation is in fact the property of the corporators. To deprive the corporation of its property, or to burden it, is, in fact, to deprive the corporators of their property or to lessen its value. Their interest, undivided though it be, and constituting only a right during the continuance of the corporation to participate in its dividends, and on its dissolution to receive a proportionate share of its assets, has an appreciable value, and is property in a commercial sense, and whatever affects the property of the corporation necessarily affects the commercial value of their interests. If, for example, to take the illustration given by counsel, a corporation created for banking purposes acquires land, notes, stocks, bonds, and money, no stockholder can claim that he owns any particular item of this property, but he owns an interest in the whole of it which the courts will protect against unlawful seizure or appropriation by others, and on the dissolution of the company he will receive a proportionate share of its assets. Now, if a statute of the state takes the entire property, who suffers loss by the legislation? Whose property is taken? Certainly, the corporation is deprived of its property; but at the same time, in every just sense of the constitutional guaranty, corporations are also deprived of their property.

The prohibition against the deprivation of life and liberty in the same clause of the fifth amendment does not apply to corporations, because, as stated by counsel, the lives and liberties of the individual corporators are not the life and liberty of the corporation.

Nor do all the privileges and immunities of citizenship attach to corporations. These bodies have never been considered citizens for any other purpose than the protection of the property rights of the corporators. The *status* of citizenship, entitling the citizen to certain privileges and immunities in the several states, does not belong to corporations. The special privileges which citizens acquire by becoming incorporated in one state cannot, therefore, be exercised in another state without the latter's consent, as was held in *Paul* v. *Virginia*, 8 Wall. 168, although such consent will generally be presumed in the absence of positive prohibition.

Decisions of state courts, in harmony with the views we have expressed, exist in great numbers. But it is unnecessary to cite them. It is sufficient to add that in all text writers, in all codes, and in all revised statutes, it is laid down that the term "person" includes, or may include, corporations; which amounts to what we have already said, that whenever it is necessary for the protection of contract or prop-

erty rights, the courts will look through the ideal entity and name of the corporation to the persons who compose it, and protect them, though the process be in its name. All the guaranties and safeguards of the constitution for the protection of property possessed by individuals may, therefore, be invoked for the protection of the property of corporations. And as no discriminating and partial legislation, imposing unequal burdens upon the property of individuals, would be valid under the fourteenth amendment, so no legislation imposing such unequal burdens upon the property of corporations can be maintained. The taxation, therefore, of the property of the defendant upon an assessment of its value, without a deduction of the mortgage thereon, is to that extent invalid.

If there were no other objection to the assessment we might, perhaps, order judgment for the amount of taxes due upon the valuation of the property, after deducting therefrom the amount of the mortgage; but there is another objection, of equal significance, which goes to the validity of the whole assessment. No opportunity was afforded to the defendant to be heard respecting it before the state board of equalization. It was made by the board under the tenth section of article 13 of the constitution, which declares that "the franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county in this state shall be assessed by the state board of equalization at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of railway laid in such counties, cities and counties, towns, townships, and districts."

Other articles of the constitution, and laws supplementing their directions, provide for the assessment by county officers of all property except "the franchise, road-way, road-bed, rails, and rolling stock" of railroads operated in more than one county, for a hearing by property holders respecting the assessment, and for its equalization by county boards. Ample security is thus afforded to individuals against erroneous and arbitrary assessments. But the assessment of the property mentioned, of railroads operated in more than one county, is placed entirely with the state board.

In *People* v. *Sup'rs of Sacramento County* the supreme court of the state said that—

"It is the manifest intent of the constitution that the valuation of the railroad property mentioned in section 10 of article 13 shall be finally fixed and determined by the state board of equalization. The state board has the

exclusive power to assess and equalize its value. Thus the constitution furnishes a system for the assessment of railroads operated in more than one county, which is separate and distinct from that provided for the assessment of other property." And again: "The portion of the section quoted (the portion above) is clearly self-executing. We are at a loss to imagine how any statute could make the duty of the state board any clearer than does this distinct and positive mandate of the constitution. If any doubt could possibly be built upon the words cited it would be dispelled by the first clause of the same section: 'All property, except as hereinafter in this section provided, shall be assessed in the county, city, city and county, town, township, or district in which it is situated, in the manner prescribed by law.' Thus by the very language of the constitution all other but the railroad property mentioned must be assessed by local assessors, in the manner prescribed by statute. The railroad property must be assessed in the manner prescribed by the section of the constitution, that is, by the state board, without the aid of statute." 8 Pac. Law J. 103.

The Political Code provides that the assessment shall be made by the state board on or before the first Monday in May of each year; that the president, secretary, cashier, or managing agent, or such officer of the corporation as the board may designate, shall furnish to the board, on or before the first Monday of April of the year, a statement, signed and sworn to by him, showing in detail the whole number of miles of railway owned, operated, or leased in the state by the corporation, and the value thereof per mile, and all its property of every kind located in the state, the number and value of its engines, passenger, mail, express, baggage, freight, and other cars, or property used in operating or repairing the railway in the state, and on railways which are parts of lines extending beyond its limits, the amount of the rolling stock in use during the year, the annual gross earnings of the entire railway, and the proportionate annual gross earnings of the same in the state, and such other facts as the board may in writing require; and that if the officer or officers designated fail to make and furnish such statement, the board shall proceed to assess the property; and the valuation fixed shall be final and conclusive. The law also provides that the property shall be assessed at its actual value; that the assessment shall be made of the entire railway in the state, including the right of way, road-bed, track, bridges, culverts, and rolling stock; that the state board shall transmit to the county assessor of each county through which the railway runs, a statement showing the length of its main track within the county, and its assessed value per mile, as fixed by a *pro rata* distribution per mile of the assessed value of the whole property;

that this statement shall be entered on the assessment roll of the county, and that at their first meeting after its receipt by the county assessor the board of supervisors of the county shall cause an order to be entered in the proper record book stating the length of the main track and the assessed value of the railway lying in each city, town, township, school-district, or lesser taxing district in the county through which the railway runs, as fixed by the state board, which shall constitute the taxable value of the property for taxable purposes in the district, and that such property shall be taxed at the same rates as the property of individuals.

We have no doubt that further legislation might have been adopted providing for notice to the company, and a system of procedure by which it might have been heard respecting the assessment. We do not understand that the supreme court of the state intended by the decision cited to hold that the tenth section of the thirteenth article is self-executing, except to the extent that it vests complete power in the state board to make the assessment of the property; not that legislation may not be had providing for the mode in which the powers of the board shall be exercised. Indeed, the concluding section of the article authorizes any legislation necessary to give effect to its provisions. Unfortunately, no such legislation has been had. The attempted legislation failed, because it did not receive in the legislature the constitutional majority, as is clearly shown by the circuit judge in his opinion. It is unnecessary to go over the ground he has completely covered.

The presentation to the state board by the corporation of a statement of its property and of its value, which it is required to furnish, is not the equivalent to a notice of the assessment made and of an opportunity to be heard thereon. It is a preliminary proceeding, and until the assessment the corporation cannot know whether it will have good cause of complaint. No hearing upon the statement presented is allowed, and when the assessment is made the matter is closed; no opportunity to correct any errors committed is provided. The presentation of the statement can no more supersede the necessity of allowing a subsequent hearing of the owners, than the filing of a complaint in court can dispense with the right of the suitor and his contestant to be there heard.

There being, then, no provision of law giving to the company notice of the action of the state board, and an opportunity to be heard respecting it, is the assessment valid? Would the taking of the com-

pany's property in the enforcement of the tax levied according to the assessment be depriving it of its property without due process of law? It seems to us there can be but one answer to these questions. There is something repugnant to all notions of justice in the doctrine that any body of men can be clothed with the power of finally determining the value of another's property, according to which it may be taxed, without affording to him an opportunity of being heard respecting the correctness of their action. And the injustice is strikingly apparent when the property consists of the great number of particulars which go to make up the taxable estate of a railroad company, requiring for any just estimate of their value accurate knowledge upon a multitude of subjects, not usually possessed without special study. We cannot assent to any such doctrine. It conflicts with the great principle which lies at the foundation of all just government, that no one shall be deprived of his life, his liberty, or his property without an opportunity of being heard against the proceeding. The principle is as old as *Magna Charta*, and is embodied in all the state constitutions, and in the fourteenth amendment of the federal constitution. The provision in this amendment is in the form of an interdict upon the states—"Nor shall any state deprive any person of life, liberty, or property without due process of law." And by due process is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and it must give to the party to be affected an opportunity of being heard respecting the justice of the judgment sought. Without these conditions entering into the proceeding, it would be anything but due process. If it touched life or liberty, it would be wanton punishment, or rather wanton cruelty; if it touched property, it would be arbitrary exaction. It is significant that the guaranty against the deprivation of property without due process of law is contained in the clause which guaranties against a like deprivation of life and liberty; and it means that there shall be no proceeding against either without the observance of all the securities applicable to the case recognized by the general law, by those principles which are established in all constitutional governments for the protection of private rights. Notice is absolutely essential to the validity of the proceeding in any case; it may be given by personal citation, and in some cases it may be given by statute; but given it must be in some form. If life and liberty are involved, there

must be a regular course of judicial proceedings; so, also, where title or possession of property is in contention. But in the taking of property by taxation the proceeding is more summary and stringent. The necessities of revenue for the support of government will not admit of the delays attendant upon judicial proceedings in the courts of justice. The statute fixes the rate of taxation upon the value of the property, and appoints officers to estimate and appraise the value. Due process of law in the proceeding is deemed to be pursued, when, after the assessment is made by the assessing officers upon such information as they may obtain, the owner is allowed a reasonable opportunity, at a time and place to be designated, to be heard respecting the correctness of the assessment, and to show any errors in the valuation committed by the officers. Notice to him will be deemed sufficient, if the time and place of hearing be designated by statute. But whatever the character of the proceeding, whether judicial or administrative, summary or protracted, and whether it takes property directly, or creates a charge or liability which may be the basis of taking it, the law directing the proceeding must provide for some kind of notice, and offer to the owner an opportunity to be heard, or the proceeding will want the essential ingredient of due process of law. Nothing is more clearly established by a weight of authority absolutely overwhelming than that notice and opportunity to be heard are indispensable to the validity of the proceeding.

In *Davidson* v. *New Orleans* the supreme court of the United States assumed this position to be unquestionable. In that case an assessment levied on certain real estate in New Orleans for draining the swamps of that city was resisted on the ground that the proceeding deprived the owners of their property without due process of law; and the court refused to disturb it for the reason that the owners of the property had notice of the assessment and an opportunity to contest it in the courts. After stating that much misapprehension prevailed as to the meaning of the terms "due process of law," and that it would be difficult to give a definition which would be at once perspicuous, comprehensive, and satisfactory, the court, speaking through Mr. Justice Miller, said that it would lay down the following proposition as applicable to the case:

"'That whenever by the laws of a state, or by state authority, a tax, assessment, servitude, or other burden is imposed upon property for the public use, whether it be for the whole state or of some more limited portion of the community, and those laws provide for a mode of confirming or contesting the charge

thus imposed, in the ordinary course of justice, with notice to the person, or such proceeding in regard to the property as is appropriate to the nature of the case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, however obnoxious it may be to other objections." 96 U. S. 104.

In *Stuart* v. *Palmer* the meaning of these terms is elaborately considered by the court of appeals of New York with reference to numerous adjudications on the subject. In that case a law of the state imposed an assessment on certain real property for a local improvement without notice to the owner, and a hearing or an opportunity to be heard by him, and the court held that it had the effect of depriving him of his property without due process of law, and was therefore unconstitutional. Mr. Justice Earl, speaking for the court, said:

" I am of the opinion that the constitution sanctions no law imposing such an assessment without a notice to, and a hearing, or an opportunity of hearing, by the owners of the property to be assessed. It is not enough that the owners may by chance have notice, or that they may, as a matter of favor, have a hearing. The law must require notice to them, and give them the right to a hearing, and an opportunity to be heard. It matters not, upon the question of the constitutionality of such a law, that the assessment has in fact been fairly apportioned. The constitutional validity of a law is to be tested, not by what has been done under it, but what may, by its authority, be done. The legislature may prescribe the kind of notice, and the mode in which it shall be given, but it cannot dispense with all notice." And, again, that "no case, it is believed, can be found in which it was decided that this constitutional guaranty [against depriving one of his property without due process of law] did not extend to cases of assessments; and yet we may infer, from certain *dicta* of judges, that their attention was not called to it, or that they lost sight of it in the cases which they were considering. It has sometimes been intimated that a citizen is not deprived of his property, within the meaning of this constitutional provision, by the imposition of an assessment. It might as well be said that he is not deprived of his property by a judgment entered against him. A judgment does not take property until it is enforced, and then it takes the real or personal property of the debtor. So an assessment may generally be enforced, not only against the real estate upon which it is a lien, but, as in this case, against the personal property of the owner also; and by it he may just as much be deprived of his property, and in the same sense, as the judgment debtor is deprived of his by the judgment." 74 N. Y. 188, 195.

We concur fully in the views thus forcibly expressed.

It remains to consider the last position of counsel, that the provisions of article 13 of the constitution of the state, as to the taxa

tion of railroad property, are to be treated as conditions upon the continued existence of railroad corporations. On the hearing, this position seemed to us to possess some force, but on careful consideration its supposed force is dissipated. The argument is that on the original creation of the corporation the state might have imposed any conditions whatever as to the manner and the amount in which its property should be taxed; that under the reserved power of amendment of the law creating the corporation, the state could at any time afterwards impose such a condition; that the new constitution, in continuing the defendant and other railroad corporations· in existence, and at the same time authorizing the taxation of their property upon a valuation different from that at which the property of individuals is assessed, imposed that condition upon them, and that the subsequent exercise of its franchises by the defendant implies an assent to such condition.

There are two answers to this argument. In the first place, article 13 is not intended to make any change in the powers or rights of corporations under the laws of the state. It treats entirely of revenue and taxation, and of the rules which shall govern the assessment of the property of individuals, and of railroad and other *quasi* public corporations. It is in another article that provisions are made for the control of railroad corporations; and the duties and responsibilities of corporations generally, and the power of the state over them, are declared.

In the second place, the state, in the creation of corporations, or in amending their charters, or rather in passing or amending general laws under which corporations may be formed and altered, possesses no power to withdraw them when created, or by amendment, from the guaranties of the federal constitution. It cannot impose the condition that they shall not resort to the courts of law for the redress of injuries or the protection of its property; that they shall make no complaint if their goods are plundered and their premises invaded; that they shall ask no indemnity if their lands be seized for public use, or be taken without due process of law, or that they shall submit without objection to unequal and oppressive burdens arbitrarily imposed upon them; that, in other words, over them and their property the state may exercise unlimited and irresponsible power. Whatever the state may do, even with the creations of its own will, it must do in subordination to the inhibitions of the federal constitution. It may confer, by its general laws, upon corporations certain capacities of

doing business, and of having perpetual succession in their members. It may make its grant in these respects revocable at pleasure; it may make the grant subject to modifications and impose conditions upon its use, and reserve the right to change these at will. But whatever property the corporations acquire in the exercise of the capacities conferred, they hold under the same guaranties which protect the property of individuals from spoliation. It cannot be taken for public use without compensation. It cannot be taken without due process of law, nor can it be subjected to burdens different from those laid upon the property of individuals under like circumstances.

The state grants to railroad corporations formed under its laws a franchise, and over it retains control, and may withdraw or modify it. By the reservation clause it retains power only over that which it grants; it does not grant the rails on the road; it does not grant the depots along-side of it; it does not grant the cars on the track, nor the engines which move them, and over them it can exercise no power except such as may be exercised through its control over the franchise, and such as may be exercised with reference to all property used by carriers for the public. The reservation of power over the franchise,—that is, over that which is granted,—makes its grant a conditional or revocable contract, whose obligation is not impaired by its revocation or change. The supreme court established, in the *Dartmouth College Case*, that the charter of a private corporation is a contract between the corporators and the state, and that it was, therefore, within the prohibition of the federal constitution against the impairment of contracts. To avoid this result the states have generally inserted clauses in their constitutions reserving a right to repeal, alter, or amend charters granted by their legislatures, or to repeal, alter, or amend the general laws under which corporations are allowed to be formed. The reservation relates only to the contract of incorporation, which, without such reservation, would be irrepealable. It removes the impediment to legislation touching the contract. It places the corporation in the same position it would have occupied had the supreme court held that charters are not contracts, and that laws repealing or altering them did not impair the obligation of contracts. The property of the corporation, acquired in the exercise of its facultites, is held independently of such reserved power, and the state can only exercise over it the control which it exercises over the property of individuals engaged in similar business.

The case of *Detroit* v. *Detroit & Howell Plank-road Co.*, in the

supreme court of Michigan, is in point on both of the propositions stated. An act of the legislature of the state, amending the charter of the company, required it to remove without the limits of the city of Detroit a toll-gate on its road, then within the limits. The effect of the act was to take from the company about two and a half miles of its road, upon which it collected tolls. The act under which the company was incorporated reserved a power in the legislature to repeal and amend it at any time, and the question was whether, under this reservation, the legislature could require the removal of the toll-gate out of the city; and it was held that it could not. Ordinarily a law requiring the removal of a toll-gate from one place to another on a road would be a mere police regulation, but here it was something more; it deprived the company of compensation for the use of its road within the city limits; that is, for a large part of the travel over it. The court, speaking through Mr. Justice Cooley, observed that there were cases in which amendments to charters having some resemblance to this had been sustained, and cited several which involved a mere police regulation, such as requiring a railroad company to build a station-house and stop its trains at a certain locality; to permit and provide for the crossing of its track; and to unite with others in a common passenger station for trains entering a city.

"But [the court added] there is no well-considered case in which it has been held that a legislature, under its power to amend a charter, might take from a corporation any of its substantial property or property rights. In some cases the power has been denied, where the interest involved seemed insignificant. The case of *Albany, etc., R. Co.* v. *Brownell*, 24 N. Y. 345, is an illustration. It was there decided that although the legislature might require railroad companies to suffer highways to cross their tracks, they could not subject the lands which the companies had acquired for other purposes to the same burden, except in connection with the provision for compensation. The decision was in accord with that in *Com.* v. *Essex Co.* 13 Gray, 239, 253, in which, while the power to alter, amend, or repeal the corporate franchises was sustained, it was at the same time declared that 'no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted.' The same doctrine is clearly asserted in *Railroad Co.* v. *Maine*, 96 U. S. 499, and is assumed to be unquestionable in the several opinions delivered in the *Sinking-fund Cases*, 99 U. S. 700.

"But for the provision of the constitution of the United States which forbids impairing the obligation of contracts, the power to amend and repeal corporate charters would be ample without being expressly reserved. The

reservation of the right leaves the state where any sovereignty would be, if unrestrained by express constitutional limitations and with the powers which it would then possess. It might, therefore, do what it would be admissible for any constitutional government to do when not thus restrained, but it could not do what would be inconsistent with constitutional principles. And it cannot be necessary at this day to enter upon a discussion in denial of the right of the government to take from either individuals or corporations any property which they may rightfully have acquired. In the most arbitrary times such an act was recognized as pure tyranny, and it has been forbidden in England ever since *Magna Charta,* and in this country always. It is immaterial in what way the property was lawfully acquired,—whether by labor in the ordinary avocations of life, by gift or descent, or by making profitable use of a franchise granted by the state; it is enough that it has become private property, and it is then protected by the 'law of the land.'" 43 Mich. 140–147; [S. C. 5 N. W. Rep. 275.]

We have already extended this opinion to a great length, and we do not think it necessary or important to notice other positions urged by counsel with great learning and ability against the validity of the taxes for which the present action is brought. We are satisfied that the assessment upon which they were levied is invalid and void, and judgment must be accordingly entered on the demurrer for the defendant, and, by stipulation of parties, the judgment must be made final.

SAWYER, C. J., *concurring.* The facts of this case are fully stated by Mr. Justice FIELD, and need not be repeated here. The questions presented are of the gravest character, and of the utmost importance to the people of California. While I concur, generally, in the conclusions, and in the line of argument adopted by my associate, I shall also state as briefly as I reasonably can, considering the gravity of the questions discussed, my conclusions upon the points involved.

1. In my judgment, the word "person," in the clause of the fourteenth amendment to the national constitution, "No state shall * * * deprive any person of life, liberty, or property without due process of law, nor deny to any *person* the equal protection of the law," includes a private corporation. It must, at least, through the corporation include the natural persons who compose the corporation, and who are the beneficial owners of all the property, the technical and legal title to which is in the corporation in trust for the corporators. The fact that the corporators are united into an ideal legal entity, called a corporation, does not prevent them from

having a right of property in the assets of the corporation which is entitled to the protection of this clause of the constitution. Nor does the intervention of this artificial being between the real beneficial owners and the state, for the simple purpose of convenient management of the business, enable the state, by acting directly upon the legal entity, to deprive the real parties beneficially interested of the protection of these important provisions. In the language of Mr. Pomeroy, one of the counsel, which I adopt:

" Whatever be the legal nature of a corporation as an artficial, metaphysical being, separate and distinct from the individual members, and whatever distinctions the common law makes, in carrying out the technical legal conception, between property of the corporation and that of the individual members, still, in applying the fundamental guaranties of the constitution, and in thus protecting the rights of property, these metaphysical and technical notions must give way to the reality. The truth cannot be evaded that, for the purpose of protecting rights, the property of all business and trading corporations is the property of the individual corporators. A state act depriving a business corporation of its property without due process of law, does, in fact, deprive the individual corporators of their property. In this sense, and within the scope of these grand safeguards of private rights, there is no real distinction between artificial persons, or corporations, and natural persons."

This principle is recognized, and the question settled for all time, in an early case by Chief Justice Marshall, in which he says:

"Aliens, or citizens of different states, are not less susceptible of these apprehensions, nor can they be supposed to be less the objects of constitutional provisions, because they are allowed to sue by a corporate name. That name, indeed, cannot be an alien or a citizen; but the persons whom it represents may be the one or the other; and the controversy is, in fact and in the law, between those persons suing in their corporate character by their corporate name for a corporate right, and the individuals against whom the suit may be instituted. Substantially and essentially the parties in such a case, where the members of the corporation are aliens or citizens of a different state from the opposite party, come within the spirit and terms of the jurisdiction conferred by the constitution on the national tribunals." *Bank U. S.* v. *Devaux*, 5 Cranch, 87.

It is upon this principle that the national courts have ever since entertained jurisdiction on the ground of citizenship of the corporators in cases wherein corporations are the parties to the record. The cases in the supreme court upon this point are numerous, and too familiar to require further citation.

In *Society, etc.,* v. *New Haven*, 8 Wheat. 464–489, it was held that a corporation was protected under the sixth article of the treaty with

England, of 1783, which reads: "There shall be no confiscations made, nor any prosecutions commenced against any *person* or *persons* for or by reason of the part which he or they may have taken in the present war, and that no *person* shall, on that account, suffer any future loss or damage, either in person, liberty, or property," etc. The word "person" in the civil-rights act of congress of April 20, 1870, (17 St. 13,) was held on the circuit to include a corporation. *N. W. Fert. Co.* v. *Hyde Park*, 3 Biss. 481.

In *Railroad Co.* v. *Richmond*, 96 U. S. 529, the supreme court assumes that a corporation is included in the word "person," as thus used in the fourteenth amendment.

The word "person" is, unquestionably, much broader in its signification than the word "citizen," and the change from the word "citizen," in the first clause of the section, to the word "person" of so much larger import, in the last, must have been well considered, and have been intended to extend the shield of the constitution to all cases which might require the protection of this wholesome and greatly-needed guaranty. There is nothing in the context to indicate a purpose to limit the meaning of the word "person" to a narrower sense than the word ordinarily and naturally imports, or to make the application of the provision partial only. To exclude corporations from its import, would be to leave, perhaps, at this day, the far larger portion of the vast capital of the country employed in great enterprises, either commercial, manufacturing, mining, or otherwise, beyond the pale of its protection. There is no good reason for excluding the property of corporations from the same protection extended to other property. It is subject to all the burdens, and it should be entitled to all the immunities, of other property. It is, at last, the property of natural persons. The provision is protective and remedial, not punitive in character, and should, therefore, be *liberally*, not *strictly*, construed. No restriction should be put upon the term not called for by the exigencies of the case, or by the public interest; and it must be manifest that the public interest requires that the broadest signification should be adopted.

Blackstone treats of corporations under the head of "Rights of Persons;" chapter 18 under this head being devoted to the subject. He says: "Persons, also, are divided by law into either natural persons or artificial;" giving a definition of each. Book 1, p. 123. So, also, does Kent, (2 Kent, 316.)

In *U. S.* v. *Amedy*, 11 Wheat. 412, wherein a person was indicted, under an act of congress, for destroying a vessel belonging to a cor-

poration, the supreme court held that a corporation is a person within the meaning of the act. The court, among other things, says: "The mischief intended to be reached by the statute is the same, whether it respects private or corporate persons. That corporations are in law, for civil purposes, deemed persons is unquestionable." And the court in this case holds the same for criminal purposes also; and in criminal cases statutes are *strictly* construed. So, in regard to the provisions of the fourteenth amendment under consideration, "the mischief intended to be reached" by the amendment, "is the same, whether it respects private or corporate persons." See, also, cases cited in the opinion. The authorities to a similar effect are numerous. See, as examples, *People* v. *Ins. Co.* 15 Johns. 588; *Planters' Bank* v. *Andrews*, 8 Porter, 404; Kyd, Corp. 15; *Douglas* v. *P. M. S. Co.* 4 Cal. 304; *State* v. *Nash. University*, 4 Humph. 166. There are many other cases affording support, more or less direct, to this view.

In, *Ins. Co.* v. *New Orleans*, 1 Woods, 85, it was held on the circuit that a corporation is not embraced in the word "person," as used in the amendment under consideration, and the supreme court of California, upon the authority of that case, made a similar ruling in *C. P. R. Co.* v. *State Bd. of Equalization*, 8 Pac. Coast Law J. 1155. But notwithstanding their high character for ability, and my respect for the decisions of the judges taking that view, I am compelled to adopt a different conclusion. I think, both upon reason and authority, that the other is the better view. Again, with respect to corporate property, I adopt the language of counsel, which expresses my view accurately and clearly:

"The property of the corporation is in reality the property of its individual corporators. A state statute depriving a corporation of its property does deprive the individual corporators of their property. These clauses of the fifth and fourteenth amendments, and the similar clauses of the state constitution, apply, therefore, to private corporations, not alone because such corporations are 'persons,' within the meaning of that word, but also because statutes violating their prohibitions, in dealing with corporations, must necessarily infringe upon the rights of natural persons. In applying and enforcing these constitutional guaranties, corporations cannot be separated from the natural persons who compose them."

It is upon this principle that the decision in *Dodge* v. *Woolsey*, 18 How. 331, rests, which establishes the right of stockholders to maintain a suit against the directors of the corporation and state officers to restrain the payment by the one, and the collection by the other, of a tax illegally assessed against the corporation. See, also, *Mar-*

*shall* v. *B. & O. R. Co.* 16 How. 327. But a corporation itself is, in my judgment, a "person," within the meaning of the constitutional provision in question. Such has been the ruling in all cases under statutes containing the word "person," unless the context clearly indicated a more limited signification.

2. I shall not spend much time in discussing the question whether the fourteenth amendment applies only to the African race. Undoubtedly, the negro furnished the immediate occasion and motive for adoption of the amendment; but its benefits could not have been intended to be limited to the negro. The protection afforded is as important to others as to him, as is clearly shown by experience under this provision. A whole race, not African, large numbers of whom came to our shores under the solemn guaranties of stipulations in a treaty suggested and sought, and in a great part framed, by ourselves, to promote our then supposed interests, were among the first to invoke this very provision of the fourteenth amendment to protect them, under the word "person," in the right to earn an honest living, by honest labor; and its protecting power was not invoked in vain. *Parrott's Chinese Case*, 6 Sawy. 349; *In re Ah Chong, (Chinese Fisherman Case,)* Id. 451. Who, in view of past experience, shall say there was no occasion to extend the signification of the word "person" beyond the negro? And are all other races, including our own, to be now withdrawn from its protecting power by so narrow and unnatural a construction. I apprehend not. If the line cannot be drawn at the negro, then no other can be adopted that will not embrace every human being in his individual character, or in his legal association with his fellows, for the more convenient administration of his property, and more successful pursuit of happiness. I apprehend that it would have struck the world with some astonishment, when this amendment was proposed to the people of the United States for adoption, if it had read: "Nor shall any state deprive any person of the *negro race* of life, liberty, or property without due process of law; nor deny to any person of the *negro race* within its jurisdiction the equal protection of the laws." Yet so it must, in effect, be read if its operation is to be limited to that race. The rights of the negro are, certainly, no more sacred or worthy of protection than the rights of the Caucasian or other races; and the security of the rights of corporations, and, through them, the rights of the real parties,—the corporators,—is as of great public importance as the security of any other private interests.

3. Does the assessment in question, made in strict pursuance of the provisions of the constitution of California, violate that clause of the fourteenth amendment of the national constitution which says that no state "shall deprive any person of life, liberty, or property without due process of law?"

The provision of the state constitution under which the assessment was made is as follows:

"The franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county in this state shall be assessed by the state board of equalization at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of road-way laid in such counties, cities and counties, cities, towns, townships, and districts."

This is the only provision affecting this question.

To take one's property by taxation is to take or deprive one of his property; and if not taken in pursuance of the law of the land—in some due and recognized course of proceedings, based upon well-recognized principles in force before and at the time this clause was first introduced into the various constitutions, and the legislation of the country—is to take it "without due process of law." The signification of these words has been the subject of judicial consideration and discussion in a vast number of cases, and their import has been determined to be the same as that of equivalent phrases in *Magna Charta*, from which the principle adopted was derived.

I shall not attempt to give an accurate definition of the term "due process of law," applicable to all cases. It is not necessary for the determination of this case to do so. It is enough to say that it has been settled by judicial decision, as I think, that whether the proceeding be judicial, administrative, or executive, if it affects life or liberty, or takes property directly, or imposes a charge which becomes the basis of taking property, some kind of notice, or opportunity to be heard on his own behalf, and to defend his rights, given to the person whose life or liberty is to be affected, or whose property is to be taken, or burdened with the liability, is an indispensable element—an essential ingredient—of "due process of law." No one, I apprehend, would for a moment contend that a man's life, or his liberty, could be legally taken away without notice of the proceeding, or without being offered an opportunity to be heard; or that a proceeding whereby his life or liberty should be forfeited, or permanently

affected, without notice or opportunity to be heard in his own defense, could, by any possibility, be by "due process of law." In such cases there could be no just conception of "due process of law" that would not embrace these elements of notice and opportunity to be heard. Any conception excluding these elements would be abhorrent to all our ideas of either law or justice. If these elements must enter into and constitute an essential part of due process of law, in respect to life and liberty, they must also constitute essential ingredients in due process of law, where property is to be taken; for the guaranty in the constitution is found in the same provision in the same connection, and in the identical language applicable to all. One meaning, therefore, cannot be attributed to the phrase with respect to property, and another with respect to life and liberty.

Having stated the principle, which I conceive to be established by an unbroken line of authorities, I shall refer to some of them. One of the latest and most instructive cases upon the subject was recently decided by the court of appeals of the state of New York, from which I shall extract a passage which I adopt as expressing my own views, and presenting the question in a very clear and satisfactory light. It involved the validity of an assessment for a public street improvement, and but one question, which was decisive of the case, was examined or determined. The question was as to the validity of the law under which the assessment was made. The court, by Mr. Justice Earl, says: "The latter assessment could be made without any notice to or hearing of any person. The law requires no notice, and a provision for notice cannot be implied. Upon the assumption that the law was valid, there was ample authority for the commissioners to make the assessment without any notice or hearing." *Stewart* v. *Palmer*, 74 N. Y. 186. The judge proceeds:

"I am of the opinion that the constitution sanctions no law imposing such an assessment without a notice to and a hearing, or an opportunity of a hearing, by the owners of the property to be assessed. It is not enough that the owners may by chance have notice, or that they may, as a matter of favor, nave a hearing. The law must require a notice to them, and give them a right to a hearing and an opportunity to be heard. It matters not, upon the question of the constitutionality of such law, that the assessment has in fact been fairly apportioned. The constitutional validity of a law is to be tested, not by what has been done under it, but what may by its authority be done. The legislature may prescribe the kind of notice and the mode in which it shall be given, but it cannot dispense with all notice. * * *" Id. 188.

"The legislature can no more arbitrarily impose an assessment for which property may be taken or sold, than it can render a judgment against a person without a hearing. It is a rule founded on the first principles of

natural justice, older than written constitutions, that a citizen shall not be deprived of his life, liberty, or property without an opportunity to be heard in defense of his rights; and the constitutional provision that no person shall be deprived of these without due process of law, has its foundation in this rule. This provision is the most important guaranty of personal rights to be found in the federal or state constitutions. It is a limitation upon arbitrary legislation. No citizen shall arbitrarily be deprived of his life, liberty, or property. This the legislature cannot do, nor authorize to be done. 'Due process of law' is not confined to any judicial proceedings, but extends to every case which may deprive a citizen of his life, liberty, or property, whether the proceedings be judicial, administrative, or executive in its nature. This great guaranty is always and everywhere present to protect the citizen against arbitrary interference with these sacred rights. * * *" Id. 190.

"No case, it is believed, can be found in which it was decided that the constitutional guaranty did not extend to cases of assessments, and yet we may infer from certain *dicta* of judges that their attention was not called to it, or that they lost sight of it in the cases which they were considering. It has sometimes been intimated that a citizen is not deprived of his property, within the meaning of this constitutional provision, by the imposition of an assessment. It might as well be said that he is not deprived of his property by a judgment entered against him. A judgment does not take property until it is enforced, and then it takes the real or personal property of the debtor. So an assessment may generally be enforced, not only against the real estate upon which it is a lien, but, as in this case, against the personal property of the owner also, and by it he may just as much be deprived of his property, and in the same sense, as the judgment debtor is deprived of his by the judgment." Id. 195.

Much more is worth quoting, but it would extend this opinion to an unreasonable length.

Thus, it is determined in the case cited that a party is not only entitled to notice and an opportunity to be heard, but that the law, or constitution itself, must expressly provide for notice. This decision was approved by the supreme court of California in October last, in *Mulligan* v. *Smith,* involving the validity of a tax. 8 Pac. Coast Law J. 499. Said *McKinstry,* J.: "In my opinion the statute provides no notice or process by means of which the property owners can be subjected to the judgment of the county court. The act is therefore void;" citing *Stewart* v. *Palmer, supra;* Cooley, Taxation, 266, and other cases; and *McKee,* J., in the same case said:

"It is a principle which underlies all forms of government by laws that a citizen shall not be deprived of life, liberty, or property without due process of law. The legislature has no power to take away any man's property, nor can it authorize its agents to do so, without first providing for personal notice to be given to him, and for a full opportunity of time, place, and tribunal to be heard in defense of his rights. This constitutional guaranty is not confined

to judicial proceedings, but extends to every case in which a citizen may be deprived of life, liberty, or property, whether the proceeding be judicial, administrative, or executive in its nature."

In *Patten* v. *Green*, 13 Cal. 329, Mr. Justice Baldwin, all the justices, including Mr. Justice Field, concurring in the opinion, said: "We think it would be a dangerous precedent to hold that an absolute power resides in the supervisors to tax land as they may choose, without giving any notice to the owner. It is a power liable to great abuse. The general principles of law applicable to such tribunals oppose the exercise of any such power." The raising of the tax by the board of equalization was held void for want of notice. Mr. Webster, in the *Dartmouth College Case*, defined due process of law, or "the law of the land," as "the general law, which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial." He adds: "Everything which may pass under the form of an enactment is not ' the law of the land.'"

In *Cooper* v. *Board of Works*, 108 Eng. C. L. R. 181, in which was in question the action of the board of public works, in pursuance of a statute which did not require notice, *Willes*, J., said: "I apprehend that a tribunal, which is by law invested with power to affect the property of one of her majesty's subjects, is bound to give such subject an opportunity of being heard before it proceeds; and that that rule is of universal application, and founded upon the plainest principles of justice." In the same case, *Byles*, J., said: "The judgment of Mr. Justice Fortescue, in *Dr. Bentley's Case*, is somewhat quaint, but it is very applicable, and has been the law from that time to the present." He says: "The objection for want of notice can never be got over. The laws of God and man both give the party an opportunity to make his defense, if he has any. I remember to have heard it observed by a very learned man, upon such an occasion, that even God himself did not pass sentence upon Adam before he called upon him to make his defense. 'Adam, where art thou? Hast thou not eaten of the tree whereof I commanded thee that thou shouldst not eat?'" See, also, *Philadelphia* v. *Miller*, 49 Pa. 448; *Matter of Ford*, 6 Lans. 92; *Overing* v. *Foote*, 65 N. Y. 263; *Westervelt* v. *Gregg*, 12 N. Y. 209; Cooley, Const. Lim. 355; *Butler* v. *Sup'rs Saginaw*, 26 Mich. 22, 29; Sedg. St. & Const. Constr. (Pomeroy's Ed.) 474 *et seq.*, and notes; Cooley, Taxation, 266, 267.

In *Davidson* v. *New Orleans*, 96 U. S. 97, it was not questioned,

but assumed, that the party taxed must have an opportunity to be heard, and decided upon that theory.

In my judgment the authorities establish beyond all controversy that somewhere in the process of assessing a tax under a law, or a state constitution, at some point before the amount of the assessment becomes finally and irrevocably fixed, the statute or the state constititution must provide for notice to be given to the owner of the property taxed, and an opportunity to be afforded to make objections, and to be heard upon them. In some form or manner he must be afforded an opportunity to defend his interests. In this case the constitution makes no provision for notice or a hearing, and the answer alleges that there was none, which is admitted by the demurrer.

4. On behalf of the plaintiff, what purports to be a statute passed March 14, 1881, (St. 1881, p. 83,) is cited, which, it is insisted, supplements the constitution, and provides for a notice and hearing upon a petition filed within five days after the assessment is made upon a railroad. But it is claimed that, although published in the volume of statutes for the year 1881 as a statute, the bill never constitutionally passed, and that it is consequently no law. Section 15 of article 4 of the constitution of California provides that "on the final passage of all bills they shall be by yeas and nays upon each bill separately, and shall be entered on the journals, and no bill shall become a law without the concurrence of a majority of the members elected to each house." Under section 5 of the same article the house consists of 80 members, of whom it would require 41 to constitute a majority of the members elected to the house. Upon reference to the published journals of the legislature it appears that the bill in question passed the house and was sent to the senate, where it was amended by adding a long provision, being the very provision, if any there is, which gives the owners of railroads of the class in question, dissatisfied with the assessment, a right to file a petition, "within five days after the assessment is made and entered of record on the books of the board," to have the assessment corrected, and providing for proceedings upon said petition. On March 4th the house considered the senate amendment, and upon a call of the yeas and nays, as required by the constitution, 39 members voted for the amendment and 32 against it, there being four paired and not voting. Thus the votes in favor of the amendment were two less than a majority of members elected to the house, and the bill failed. It does not appear that the bill was "read

at length." The speaker declared that this was not the final action of the house, and that the amendment concurred in by a vote of 39 ayes to 32 nays was adopted. An appeal having been taken from this decision of the chair, it was afterwards laid upon the table. Thereupon two members filed each a separate protest against the decision of the speaker, and the certificate that the bill had passed, on the expressed ground that it did not receive the vote of a majority of the members elected to the house. All this appears upon the journal. If this was not the final action of the house, then, as there was no further action, the act never finally passed, even by the numbers indicated. Assembly Journal, 24th Sess. pp. 472–475.

The bill, therefore, never was constitutionally passed, and never became a law. Whether the bill became a law is a question of law of which the court will take judicial notice. *Sherman v. Storey*, 30 Cal. 253; *Ottawa v. Perkins*, 94 U. S. 268; *Gardner v. The Collector*, 6 Wall. 509, 510; *Post v. Sup'rs*, 105 U. S. Under the decisions of the courts upon constitutional provisions in all respects similar to that in the present constitution of California, it is settled that the court, to inform itself, will look to the journals of the legislature. So the supreme court of the United States holds where it is so decided by the state courts in construing their own constitutions and laws. See cases last cited. I am not aware of any decision of the supreme court of California giving a different construction to the state constitution as it now stands. Unless this mode is adopted of resorting to the journals to ascertain whether a statute has been legally passed or not, experience, and the number of cases that have already arisen under similar constitutional provisions, demonstrate that the requirement of the constitution that the vote shall be taken by yeas and nays, and a majority of the members required to vote in the affirmative on the final passage of an act, would be of little avail.

While we think the case of *Sherman v. Storey* correctly decided under the constitution as it then was, we are of the opinion that the change in the constitution requires a change in the rule. When California adopted from other states the provision now found in its constitution substantially as found in the constitution of Illinois, it must be deemed to have adopted with the provision the settled construction put upon it by the courts of the state from which it was taken. The leading cases upon the point are *Spangler v. Jacoby*, 14 Ill. 278; *Prescott v. Board of Trustees, etc.*, 19 Ill. 326; *Osborn v. Staley*, 5 W. Va. 89; and the cases cited in *Sherman v. Storey*, and

in those from the United States supreme court. In this case there is something more than an omission in the journals, for it affirmatively appears what the vote was, and that the bill did not pass by the vote required by the constitution.

Statutory provisions, also, have been adopted, which appear to be designed to give effect to this change in the constitution. Section 255 of the Political Code requires the minute clerks of the senate and assembly to "keep a correct record of the proceedings of their respective houses." And sections 256 and 257 require the daily proceedings to be recorded in the journals, and that they "must be read by the secretary each day of meeting, and then be authenticated by the signatures of the president and speaker of the respective houses." Section 1875, Code C. P., provides that "courts take judicial notice of the following facts: * * * Public and private official acts of the legislative, executive, and judicial departments of this state, and of the United States," etc. * * * "In all these cases the court may resort for its aid to appropriate books of documents of reference." Section 1888 provides that "public writings are (1) the written acts or records of the acts of the sovereign authority of official bodies and tribunals, and of public officers, legislative, judicial, and executive, whether of this state or of the United States," etc. And section 1918 provides that "official documents may be proved as follows: * * * (2) The proceedings of the legislature of this state, and of congress, by the journals of those bodies respectively, or either house thereof, or by published statutes or resolutions." Thus the journals of the legislature are put upon the same footing as the statutes. We think there can be no doubt, under the constitution of the state and these statutes, that we may look to the journals to see what action was in fact had with respect to any apparent law as published in the volumes of the statutes of the state; and looking to the journals it affirmatively appears that the act upon the statute book in question never did become a law.

Even if the act had passed, it is at least extremely doubtful whether the notice, or time for filing the petition, is sufficiently definite to be of any effect. The assessment, under the provision, might be made, even if the party is bound to notice the state of the record on the first Monday of May, the five days might elapse, and the assessment be transmitted to the county, before the party assessed would know, under the law, that it had been made. All the acts of assessment may have transpired, and the assessment become final, before the first Monday of May. The board, however, is not required to make it before

that day, although it might do so, and the party assessed can scarcely be expected to watch its proceedings, from day to day, before the time fixed by the law.

There being, then, no such statute as is relied on in existence, the validity of the assessment must rest alone upon the constitutional provision quoted, and the act of 1880, adding sections 3664 and 3665 to the Political Code; and neither provides for notice of any kind, or for an opportunity to be heard in any stage of the proceedings. It was therefore made without due process of law, as we understand the meaning of that provision as used in the fourteenth amendment in question.

Section 3664 of the Political Code, as adopted in 1880, requires the president, or some other designated officer of the class of corporations in question, to furnish the state board of equalization, on or before the first Monday of April in each year, a detailed statement of the whole number of miles of road operated, the number of cars, amount of rolling stock, and their value, the gross earnings, and various other particulars; and requires the said board, on or before the first Monday in May, to assess the franchise, road-way, road-bed, rails, and rolling stock. It is urged on the part of the plaintiff that this provision furnishes sufficient notice and opportunity to be heard, to constitute due process of law on this point, within the meaning of the constitutional provision. In our judgment, this position is clearly untenable. This is simply a mode adopted for obtaining information as to the amount and general value of the property of the corporation, as a basis in part, at least, for their future consideration and action in making the assessment. It is but a preliminary step and not the assessment, or any part of the assessment. The board is under no obligation to adopt either the statement as to what the property is, or its value. It may reject it altogether and adopt an entirely different basis. The party interested is entitled, at some point of the proceeding, to know what action the board takes, or proposes to take; and to an opportunity to be heard, as to its propriety, before the assessment becomes fixed and irrevocable. Other classes of property holders, also, are required to file a statement of their property under oath, yet in the scheme provided for their assessment an opportunity to be afterwards heard is provided for.

The constitutions of the state and nation provide that private property shall not be "taken for public use without just compensation." When parties cannot agree, there must be some mode provided for

ascertaining the value of property so proposed to be taken for public use under the sovereign right of eminent domain. Suppose a statute should provide a board, or even a court, to assess the value of property proposed to be taken under this power for railroad purposes, or other public use, and should give the owner of the property no notice or opportunity to be heard, other than to require him at some time, say a month anterior to the consideration and determination of the amount to be paid, to furnish such board or court a similar statement as to the description and value of the property to that required by section 3664, which the party might do or omit to do; would a subsequent *ex parte* determination of the value, by the board or court, be in pursuance of due process of law within the meaning of the constitution? I apprehend that no court would sustain such a proceeding. I also think that a taking for the purposes of taxation under such an assessment, without notice or opportunity to be heard, would be equally without the protection of due process of law, and equally void.

The state supreme court has held the provision in the constitution of California, authorizing the state board of equalization to assess, finally, the railroads of the class in question, to be self-executing, requiring no legislation of any kind to carry it into full effect; also that the provision is mandatory, *S. F. & N. P. R. Co.* 8 Pac. Coast Law J. 1061.

It is insisted by defendant that, this being so, it is incompetent for the legislature to add to or take from the requirements found in the constitution, and that the additional provision of section *3664*, as adopted in 1880, is void. The view already expressed upon the section renders it unnecessary now to determine that question, although presented by the record and argued by counsel. It would seem, however, that there can be no constitutional objection to legislating upon details for the purpose of more effectually carrying out the scheme of the constitution, so far as the legislation is not inconsistent with any of its provisions. It is a general rule that a state legislature has all legislative power not inhibited by the constitution, state or national. *S. P. R. Co.* v. *Orton*, 6 Sawy. 186.

This being so, it would seem that the legislature might supplement the constitutional provision by statutory provisions intended to more perfectly protect the rights of the parties by other safeguards which are not inconsistent with the constitutional provision. But as this is a question more properly belonging to the state courts, we do not deem it desirable to finally determine it now.

5. Is the provision of the state constitution, under which the assessment in question was made, in conflict with the provision of the fourteenth amendment to the national constitution which provides that no state "shall deny to any person the equal protection of the law?" The circuit justice has discussed this question so fully and satisfactorily that I shall have little to add. The provision is:

"A mortgage, deed of trust, contract, or other obligation by which a debt is secured, shall for the purposes of assessment and taxation, be deemed and treated as an interest in the property affected thereby. Except as to railroad and other *quasi* public corporations, in case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract, or obligation, less the value of such security, shall be assessed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof, in the county, city, or district in which the property affected thereby is situate. The taxes so levied shall be a lien upon the property and security, and may be paid by either party to such security. If paid by the owner of such security, the tax so levied upon the property affected thereby shall become a part of the debt so secured. If the owner of the property shall pay the tax so levied on such security, it shall constitute a payment thereon, and to the extent of such payment a full discharge thereof; provided, that if any such security or indebtedness shall be paid by any such debtor or debtors, after assessment and before the tax levy, the amount of such levy may likewise be retained by such debtor or debtors, and shall be computed according to the tax levy for the preceding year."

Whatever the property, then, real or personal, mortgaged to secure a debt, the value of the debt so secured, in the case of everybody except "a railroad and other *quasi* public corporations," is to be deducted from the value of the property mortgaged; and the value only of the property mortgaged, "less the value of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof;" that is to say, that, whatever the property, it shall be taxed to the real owner. But in the case of "a railroad or other *quasi* public corporation," there is to be no reduction of the value of the mortgaged property, and the whole is to be taxed to one party, whether he owns the whole or not. In one case, if property is mortgaged to the extent of half its value, the owner is assessed upon one-half the value, and the owner of the debt secured is taxed upon the other half. But in the other case the owner of the legal title to the property is assessed and taxed upon the whole value of the property, and the other party, who is interested to the extent of one-half, upon none. A., a natural person, has $50,000 in cash—all the property he has—and purchases of B., another natural person, a piece of real estate for $100,000,

that being its actual value, paying one-half down, and giving a mortgage for $50,000 to secure the balance of the purchase money. The constitution in effect says—and in this instance such is the real, actual state of facts—that A. and B. each has $50,000 in the property, one-half not having been paid for by A., and each shall be assessed and pay a tax upon his own interest in it, amounting to $50,000. A., in this instance, is worth only $50,000, and if. he pays taxes upon a larger amount he pays taxes upon property he does not own—upon property owned by somebody else. This seems to be a self-evident proposition.

C., "a railroad or other *quasi* public corporation," also has $50,000 cash, and purchases of B., for its proper use, an adjoining piece of real estate for $100,000, which is also its actual value, paying $50,000, and giving a mortgage to secure the balance of the purchase money. In this case, as in the other, the actual interest of each in the property is $50,000. They stand upon precisely the same footing in all particulars with reference to the property. C. has only $50,000 in the property,—it not having paid for the other half,—and B. the rest. But in this case the constitution says that C. shall, nevertheless, be assessed for, and pay taxes upon, the whole property, double the amount he owns, and B. shall not be required to pay anything; that is to say, that C. shall not only pay the tax on its own property, but the tax upon B.'s property; that money, to the amount of the tax assessed upon $50,000 belonging to B., shall be taken by the state or county from C., and appropriated to the use and for the benefit of B., to liquidate B.'s share of the public burdens. This sum, being so much more than C.'s share of the public burdens, and being in fact B.'s share, the result of the operation is not only to take so much property from C. for public use without compensation, but also to arbitrarily take it from C., and apply it to the use and benefit of another private party, B., without compensation. The result would be the same whether the property of A., B., and C., thus situated and mortgaged is land, a railroad operated in one or more counties, or any other kind of property. Does a law which authorizes such proceedings—such discriminations—bear or press equally upon A. and C., or equally upon B. and C.? Is C. equally protected in his rights of property with A., or equally protected with B.? Although situated precisely alike with reference to their property, do they feel the pressure of the public burdens equally and alike? The question does not appear to me to admit of argument. Upon the very statement of the proposition it seems to me to be self-

evident that a law authorizing and requiring such proceedings does not afford, but expressly denies, the equal protection of the law. The constitution in the one case says that "the mortgage, deed of trust, contract, or obligation" shall be "deemed and treated as an interest in the land affected thereby," which, in the cases supposed, together with the debt secured, it undoubtedly in fact is; but in effect the constitution says it is not so in the other case. Different kinds of property may require to be taxed in different forms and modes, in order to be equally taxed; and classifications of property, for purposes of taxation, should have reference to the just equality of burdens, so far as that is practically attainable. Classification should have reference to the different character, situation, and circumstances of the property, making a different form or mode of taxation proper, if not absolutely necessary. It cannot be arbitrarily made with mere reference to the nationality, color, or character of the owners, whether natural or artificial persons, without any reference to a difference in the character, situation, or circumstances of the property. If the arbitrary discrimination and classification found in this case can be legally made under the constitution and the law of the land, then the constitution or the law can be so framed as to dispose of a man's rights in property of all kinds by arbitrary classification and definition, without regard to the real facts, circumstances, or condition of the property. A person may be classified and defined out of the equal protection of the law; and if so with reference to this provision, he can also be classified and defined out of uniformity in the operation of the law in other particulars; out of the protection of due process of law, and of the provision forbidding a law impairing the obligation of contracts, or taking property for public use without just compensation; and, indeed, out of all the guaranties of the constitution, state or national. I am not arguing that property of all kinds may not be taxed where it is found; but in this case there is a personal liability sought to be enforced against the defendant for taxes not imposed upon others in like circumstances, without any means provided for reimbursement, such as are applicable to others similarly situated, by the party who ought to pay the tax.

What constitutes the equal protection of the law is well stated in *Ah Kow* v. *Nunan*, 5 Sawy. 562; *In re Ah Fong*, 3 Sawy. 144; *Pearson* v. *Portland*, 69 Me. 278; *Portland* v. *Bangor*, 65 Me. 120; *Missouri* v. *Lewis*, 101 U. S. 22. See, also, *Live Stock, etc., Ass'n*, v. *Crescent City Co.* 1 Abb. 398; *Parrott's Chinese Case*, 6 Sawy. 377. That inequality and different principles of taxation of persons simi-

larly situated, as in this case, is a violation of this provision seems to be already determined by the supreme court of the United States. The civil-rights act, as re-enacted in 1870, and again in the Revised Statutes, provides that—

"All persons within the jurisdiction of the United States shall have the same right in every state and territory * * * to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 16 St. p. 144, § 16; Rev. St. 1977.

The congress which passed this act embraced many of the members who were in the congress which framed and proposed the fourteenth amendment, and they may be supposed to be well informed as to the purpose and scope of that amendment. This act was passed in pursuance of the last clause of the amendment, as a part of the appropriate legislation to enforce its provisions. It is therefore a legislative construction as to the scope of the provision inhibiting the states from denying to any person the equal protection of the law. The United States supreme court gives the amendment a similar construction as to its scope. In *Strauder* v. *West Virginia* the court says that sections 1977 and 1978 of the Revised Statutes "partially enumerate the rights and immunities intended to be granted by the constitution," and after quoting section 1977, as above set out, adds: "This act puts in the form of a statute what had been substantially ordained in the constitutional amendment. It was a step towards enforcing the constitutional provision." 100 U. S. 311.

In *Ex parte Virginia* the court, referring to *Tennessee* v. *Davis* and *Strauder* v. *West Virginia,* said:

"We held that the fourteenth amendment secures, among other civil rights, to colored men, when charged with criminal offenses against a state, an impartial jury trial, by jurors indifferently selected, or chosen without discrimination against such jurors because of their color. We held that immunity from any such discrimination is one of the equal rights of all persons, and that any withholding it by a state is a denial of the equal protection of the laws, within the meaning of the amendment. We held that such an equal right to an impartial jury trial, and such an immunity from unfriendly discrimination, are placed by the amendment under the protection of the general government, and guarantied by it. We held, further, that this protection and this guaranty, as the fifth section of the amendment expressly ordains, may be enforced by congress by means of appropriate legislation." 100 U. S. 345.

If discrimination in fixing the qualifications of jurors inferentially violates the provisions of the fourteenth amendment, as denying the equal protection of the law, it is not easy to perceive why discriminations in the assessment and collection of taxes expressly made are not equally so.

Thus it appears that the supreme court regards the section quoted as within the scope of the fourteenth amendment, and the act provides that every person "shall be subject to like * * * taxes, licenses, and exactions of every kind, and to no other," as "white citizens;" and this is held to be appropriate legislation to enforce the amendment. We have already seen that this defendant is subjected to taxes and exactions other than and different from those imposed upon "white citizens." We have already held that the word "person," as to property rights, as used in the amendment in question, includes a corporation, and, as used in the provision of the statute cited, it includes a corporation by express definition of the statute itself, which says, in terms: "In determining the meaning of the Revised Statutes * * * the word 'person' may extend and be applied to partnerships and corporations." Page 1, tit. 1, c. 1, § 1.

The provision of the constitution of the state of California in question, therefore, violates the provision of the fourteenth amendment in denying to defendant the equal protection of the law. "An unconstitutional law is void, and is no law." *Ex parte Siebold,* 100 U. S. 376. "The constitution and laws of the United States are the supreme law of the land, and to those every citizen of the United States owes obedience, whether in his individual or official capacity. * * * The laws of the state, in so far as they are inconsistent with the laws of congress on the same subject, cease to have effect as laws." Id. 392, 397.

6. It is further urged on the part of plaintiff that, under the state constitution, the legislature is authorized to alter or repeal the laws under which corporations are formed,—they cannot be properly called charters,—and that this mode of taxing corporations, in effect, operates as an amendment of the act authorizing the formation of corporations, and that corporations hold their franchises in subordination to that provision.

The proceeding in question is either taxation or something else; either an exercise of the sovereign right of taxation, or the exercise of some other power; either taxation or not taxation. The provision, in terms, purports on its face to provide for taxation. The convention that framed the article, and the people, when they adopted it,

evidently must have supposed they were providing a scheme of taxation. The provision admits of no other construction.

The provision is found in the chapter entitled "Revenue and Taxation," and the section says: "For the purpose of assessment and taxation," etc. If the proceeding is taxation, then it provides, and can only provide, for taking from the defendant an amount of money equal to its just share of the public burden relieved by the taxation, and nothing more. Anything beyond that is taking private property for public use without compensation. If the proceeding is taxation, there is no necessity for resorting to any other provision of the constitution. If it is not taxation,—if the amount demanded, or the principle adopted, is imposed as a condition of continued existence, or as a limitation of its rights to exercise its franchises,—then it is an annual bonus demanded for the franchise, or the privilege of existence, such as was formerly often demanded and paid by corporations for the special privileges given by special charters, when there were no restrictions upon the legislative power upon the subject, and is not taxation. If it is a bonus demanded and paid for this right, then, in addition, the corporation is subject to taxation upon its property; for under the constitution all property must be taxed. "All property in the state," says the constitution, "not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law." Article 13, §§ 1, 6, says that "the power of taxation shall never be surrendered or suspended by any grant or contract to which the state shall be a party." If, therefore, the provision of section 4 relative to "railroad or other *quasi* public corporations" is a term or condition of the contract upon which its existence and further exercise of its franchises depend, then it must still be liable to taxation on its property in the proper mode. By a contract authorizing certain persons to form a corporation and exercise its franchises, however valuable the consideration received, the state cannot, as we have seen, surrender or suspend its right to tax its property besides, as all other property is taxed. Other tax-payers are entitled to have the property of corporations properly taxed. Again, if the submission to this mode of what is called taxation becomes a valid condition of the continuance of the further existence of the corporation, and the further exercise of its franchises, then a refusal to pay the tax is a violation of the conditions of its being, and the courts, upon a proceeding for the purpose by the state in the nature of a *quo warranto*, would probably adjudge the forfeiture of its charter and wind up its affairs. This would be the appropriate rem

edy. I apprehend that no court would so adjudge under the present constitution on that ground. It is clear to me, therefore, from these considerations and the express terms themselves of the constitution, that the provision in question attempts to provide only for exercising the sovereign power of taxation,—has no other end to accomplish, and accomplishes no other purpose,—and that the rights of the parties must be determined on that hypothesis alone. Again, the general act authorizing the formation of corporations confers upon those complying with its provisions certain rights, franchises, and privileges. It endows the parties as organized with certain faculties and capacities, the result being to give them in their united character, under a certain name, a capacity to do business and acquire property. A law merely authorizing the formation of a corporation gives the corporation formed no property. That must be acquired by the corporation for itself. The legislature, under the various guaranties of the constitution, state and national, can only take away, limit, enlarge, or modify that which it gave. And what is given in the creative act is, simply, its capacities; its legal faculties, including all such as are essential to its corporate existence; all those powers which are strictly corporate, being those powers which can only be given by legislative act; powers not possessed by natural persons or partnerships, acting in their natural, individual, or associate characters, independent of legislation. These strict corporate powers I attempted to define in *Orton's Case*, 6 Sawy. 187. The powers thus given, essential or otherwise, and their future exercise, may be modified, or otherwise affected, by subsequent legislation. A corporation having been formed with capacity to acquire and hold property, the legislature may, doubtless, grant to it, as well as to natural persons capable of taking, property rights; but such rights of property, when once vested, can no more be withdrawn than the property acquired from other sources, or than property granted to, or acquired by, natural persons. The property acquired in the exercise of its corporate faculties, from whatever source derived, is the property of the metaphysical being called the corporation, held, however, in trust for the sole benefit of the corporators. As such, it is protected like all other property, and can only be taken by the law of the land, in some one of the modes not inhibited by the constitution. It cannot, in my judgment, be taken even as a further condition of corporate existence without the assent of the corporation or its corporators. There is no consent in this case to submit to any such conditions, and that is not the basis upon which the action is brought. There is no promise

to pay a bonus set out in the complaint upon which an action can be maintained. I apprehend that a mere provision in the form of a statute, or a state constitution adopted after the formation of a corporation, that corporations under the laws should cease to exist unless they surrender to the state all the property theretofore acquired by the corporation, would be void. And power to demand a part, as a condition of existence, however small, is power to demand all. Such a statutory demand would be but a flimsy guise or pretext for evading all the guaranties of the constitution, which would not for a moment be tolerated. It would be to seek indirectly what could not be attained directly; the accomplishment of an unlawful end by what, at best, is but apparently lawful means. See, on this point, *Parrott's Chinese Case*, 6 Sawy. 349; opinion of *Hoffman*, J. In that case I had occasion to say:

"The end being unlawful and repugnant to the supreme law of the land, it is equally unlawful and equally in violation of constitution and treaty stipulations to use any means, however proper or within the power of the state for lawful purposes, for the attainment of that unlawful end, or accomplishment of that unlawful purpose. It cannot be otherwise than unlawful to use any means whatever to accomplish an unlawful purpose. This proposition would seem to be too plain to require argument or authority. Yet there is an abundance of authority on the point, although, perhaps, not stated in this particular form. *Brown* v. *Maryland*, 12 Wheat. 419; *Ward* v. *Maryland*, 12 Wall. 431; *Woodruff* v. *Parham*, 8 Wall. 130–140; *Hinson* v. *Lott*, Id. 152; *Welton* v. *Missouri*, 91 U. S. 279–282; *Cook* v. *Pennsylvania*, 97 U. S. 573."

The observations of Mr. Justice Field in *Cummings* v. *Missouri*, 4 Wall. 325, are pertinent in this connection. He said:

"The deprivation is effected with equal certainty in the one case as it would be in the other, but not with equal directness. The purpose of the law-maker in the case supposed would be openly avowed; in the case existing it is only disguised. The legal result must be the same; for what cannot be done directly cannot be done indirectly. The constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name. It intended that the rights of the citizen should be secure against deprivation for past conduct by legislative enactment under any form, however disguised. If the inhibition can be evaded by the form of the enactment, its insertion in the fundamental law was a vain and futile proceeding." See, also, *Henderson* v. *Mayor of N. Y.* 92 U. S. 268; *Chy Lung* v. *Freeman*, Id. 279; *Railroad Co.* v. *Huson*, 95 U. S. 472.

The foregoing observations apply equally well to any effort to obtain the property of corporations by irregular means not applicable to natural persons. It seems to me that under our general system embodied in the constitution, providing for corporations, which for-

bids the granting of any special privileges not enjoyed by all other persons, it was intended to put corporations, with respect to their property and to all other matters, except what is in fact granted by the laws, in all particulars upon the same footing as natural persons.

In my judgment, the state constitutional provisions under consideration, and the laws passed to carry them out, violate the provision of the fourteenth amendment in question in two vital particulars: (1) They assess railroad and other *quasi* public corporations upon a different basis from that adopted with respect to the natural persons similarly situated, in the particulars herein pointed out; (2) they provide, with respect to natural persons, notice and an opportunity to be heard in the course of the proceeding to assess their property before the assessment becomes fixed, while they afford no such notice or opportunity to be heard to railroads and other *quasi* public corporations; and in both these particulars deny to the latter the equal protection of the law within the meaning of the fourteenth amendment to the national constitution.

Again, this suit is for a tax and nothing else. It proceeds upon that idea, and the idea alone, that a valid tax has been assessed against the defendant, which this action is brought under the statute to recover. The suit cannot be maintained upon a liability imposed under other and different provisions of the constitution. If it cannot be maintained as for a tax it must fail. The recovery, if any is had, must be upon the cause of action alleged.

We do not conceive that a provision for assessing railroads operated in more than one county, by the state board of equalization, while other local property is assessed by the local assessors, would be denying the equal protection of the law, provided the assessment in the former case is, in all respects, made upon the same basis, under the same rules, and upon the same principles as to value, notice, opportunity to be heard, etc., as in the latter. The presumption would be that all the officers would perform their duties justly under the law, and that the assessments so made upon property, differently circumstanced, would operate equally. Nor do we think that the assessment of the "franchise, road-way, road-bed, rails, and rolling stock of all railroads operated in more than one county in the state," "by the state board of equalization," as a unit, and apportioning the amount of the assessed value to the several counties, etc., in proportion to the number of miles in each, is objectionable, on the ground that it denies the equal protection of the law to the owner of the road.

Indeed, this seems to be the only practicable way of assessing such a road. It is owned and operated as a unit, and cannot be otherwise usefully employed. Its income, expenses, and management, and all its operations, are as a unit. Its rolling stock is at one point at one moment, and at another at a different point of time, but it is all working together as a unit to the accomplishment of one end. In fragments and isolated parts, the road would be comparatively valueless as property. It is only as a unit that it can be properly considered or properly taxed. To tax it otherwise would be to tax it upon principles materially different from those applicable to other property necessarily considered and used as a unit. The character and circumstances of the property are such as seem to justify a classification for this purpose. These points, also, seem to be determined in favor of the plaintiff in the *State Railroad Tax Cases*, 92 U. S. 575. The other points determined in this case are not involved in those cases.

Whatever public inconvenience may temporarily result from our decision,—and it must necessarily be great,—being satisfied, as we are, that the provisions of the state constitution now in question violate the inhibitions of the fourteenth amendment, our duty is plain, and we cannot, if we would, shrink from its performance. There must be judgment for the defendant.

Since the argument in these cases commenced, apparently in anticipation of what must necessarily be the result, various means, more or less violent, have been suggested, through the public press and elsewhere, to prevent railroad corporations from escaping the payment of their just share of the public burdens: such as taking away their franchises; seizing and appropriating their property first, and litigating the right afterwards; and punishing by the severest penalties the officers of all such corporations, in all cases where resistance to payment of a tax is made in the courts, however illegal the exaction or whatever the ground of complaint on their part may be. Violent counsels of this character usually result in constitutional and statutory provisions such as those we have been considering and held void, which render it necessary to seek the protection of our national *magna charta*. It would be idle—utterly futile—to insert a provision in the national constitution guarantying to every person within its jurisdiction his life, his liberty, and his property, if certain classes can be selected out in the subordinate legislation of the country to be visited with condign punishment if they even seek to invoke the protection of this beneficent guaranty against discriminating and wrong-

ful legislation. If a single individual can be deprived of the protection of this provision by such means, so can all. If such things can be, wherein does the protection of the guaranty consist?

A far wiser and more statesmanlike proceeding would seem to be, to avoid all occasion for resistance to wrong in the guise of void laws, by coolly and calmly re-examining the subject in the light of past experience, and so amending our state constitution and statutes as to bring them into entire harmony with all the guaranties of the fourteenth amendment, "the crowning glory of our national constitution" —that noblest and best written constitution ever devised by the wisdom of man.

If the life, liberty, property, and happiness of all the people are to be preserved, then it is of the utmost importance to every man, woman, and child of this broad land that every guaranty of our national constitution, whatever temporary inconvenience may be felt, be firmly and rigorously maintained at all times and under all circumstances. In the language of the supreme court of the United States:

"The constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine involving more pernicious consequences was ever invented by the wit of man, than that any of its provisions can be suspended during any of the great exigencies of government. Such a doctrine leads directly to anarchy or despotism." *Milligan's Case*, 4 Wall. 120.

I concur in the judgment ordered by the circuit justice.

### ORDER STAYING PROCEEDINGS.

As the questions we have considered are of the greatest importance, and their correct solution concerns not merely the railroad corporation, which is the defendant, but corporations of every kind, other than municipal, we shall order a stay in all the other cases (not decided to-day) now pending in this court involving the same questions, until these cases can be brought before the supreme court of the United States, and the questions involved shall have received by its judgment their final and authoritative determination. If the decision now reached be there sustained, the state will be obliged to order a new assessment, in making which the defendant will be allowed a deduction in the valuation of its property for the mortgage thereon, and also a hearing before the state board of equalization with respect to the assessment. If, on the other hand, the decision be reversed,

the other cases can be at once disposed of. By taking out a writ of error immediately on the judgment now rendered, it is possible that the case may be advanced on the calendar and be heard at the coming term.

## NOTE.

CONSTITUTIONAL LAW—FOURTEENTH AMENDMENT. The fourteenth amendment to the federal constitution contains prohibitions which have exclusive reference to the action of the state government, (*Virginia* v. *Rives,* 100 U. S. 313; *Ex parte Virginia,* Id. 339; *U. S.* v. *Cruikshank,* 92 U. S. 542,) and is a guaranty of protection against state action, (Id.; *Slaughter-house Cases,* 16 Wall. 36.) It created no new right, but operated upon legal rights as it found them established and declared that such as they were, in each state, they should be enjoyed by all persons alike, (*Ward* v. *Flood,* 48 Cal. 36,) and furnished an additional guaranty against any encroachment by the states upon the fundamental rights which belong to every citizen, as a member of society, (*U. S.* v. *Cruikshank,* 92 U. S. 543; *Virginia* v. *Rives,* 100 U. S. 313; *Van Valkenburg* v. *Brown,* 43 Cal. 43; *U. S.* v. *Hall,* 13 Int. Rev. Rec. 181,) by preventing states from doing that which will deprive the person of property, and not from regulating the use of property, (*Munn* v. *Illinois,* 94 U. S. 134.) The object of the constitution is justness and fairness. *Wisconsin Cent. R. Co.* v. *Taylor Co.* 52 Wis. 43. The amendment was designed to secure equal rights to all persons, (*Ex parte Virginia,* 100 U. S. 339;) and it applies to all persons, whether native or foreign, while within the jurisdiction of the United States, (*Ex parte Ah Fong,* 3 Sawy. 144.)

EQUAL PROTECTION OF THE LAWS. The provision as to equal protection of the laws contemplates the protection of persons and classes of persons against unjust discrimination by a state, (*Missouri* v. *Lewis,* 101 U. S. 22,) but it does not relate to territorial or municipal arrangements made for different portions of the state, (Id.;) for a state may establish one system of law in one portion of its territory and another system in another portion, provided it does not abridge the privileges and immunities of citizens of the United States, nor deprive a person of his rights without due process of law, nor deny any person within its jurisdiction an equal protection of the law, (Id.) Equal protection of the law implies not only equal accessibility to courts for the protection or redress of wrongs and the enforcement of rights, but equal exemption with others of the same class from all charges and burdens of every kind. *Ex parte Ah Fong,* 3 Sawy. 144. A law which declares that one class of persons shall have no redress, which redress is given to all by the general statutes, is in conflict with this amendment. *Pearson* v. *City of Portland,* 69 Me. 281. While the general statute remains in force for the protection of one class of persons within the jurisdiction of the state, it must remain in force for the protection of all others similarly situated. Id. A state constitution is a law in so far that it cannot violate the provisions of the federal constitution; so held as to the provision relating to the impairment of the obligations of contracts. *Dodge* v. *Woolsey,* 18 How. 331; *Groves* v. *Slaughter,* 15 Pet. 449; *Railroad* v. *McClure,* 10 Wall. 511; *Delmas* v. *Ins. Co.* 14 Wall. 667; *Gunn* v. *Barry,* 15 Wall. 610; 8 N. B. R. 1; *Moultrie Co.* v. *Savings Bank,* 92

U. S. 632; *In re McLean*, 2 N. B. R. 173; *Marsh* v. *Burroughs*, 1 Woods, 463; *Osborn* v. *Nicholson*, 1 Dill. 235; *Hawkins* v. *Filkins*, 24 Ark. 286; *Jacoway* v. *Denton*, 25 Ark. 625; *McNealy* v. *Gregory*, 13 Fla. 417; *Homestead Cases*, 23 Grat. 266; *Furman* v. *Nichol*, 8 Wall. 44; *Moore* v. *Ill. Cent. R. Co.* 4 Chi. Leg. News, 123; *Edwards* v. *Jager*, 19 Ind. 407; *Logwood* v. *Planters' Bank*, 1 Minor, 23; *Chicago* v. *Rumsey*, 87 Ill. 348; *Ex parte Lee's Bank*, 21 N. Y. 9; *Rutland* v. *Copes*, 15 Rich. 84; *Hazen* v. *Union Bank*, 1 Sneed, 115; *Keith* v. *Clark*, 2 South. Law Rev. 24; *Union Bank* v. *State*, 9 Yerg. 490; *Jones* v. *Brandon*, 48 Ga. 593; *Chambliss* v. *Jordan*, 50 Ga. 81. And so of a constitutional amendment, (*Pacific R. Co.* v. *McGuire*, 20 Wall. 36; *Keith* v. *Clark*, 97 U. S. 454;) or a change in a state constitution, (*Dodge* v. *Woolsey*, 18 How. 331; *Matheny* v. *Golden*, 5 Ohio St. 361.)

DUE PROCESS OF LAW. The principle is universal that no man's property can be taken from him without his consent, express or implied, except by due course of law. *Blackman* v. *Lehman*, 63 Ala. 547. "Due process of law" means such an exertion of the powers of government as the settled maxims of the law permit and sanction. *Bertholf* v. *O'Reilley*, 18 Am. Law Reg. (N. S.) 119; *Ex parte Ah Fook*, 49 Cal. 402. It means law in its regular course of administration through courts of justice, (*Barker* v. *Kelly*, 11 Minn. 480; *Rowan* v. *State*, 30 Wis. 129; *State* v. *Becht*, 23 Minn. 413;) the law of the land, (*Matter of Meador*, 1 Abb. U. S. 331; *Murray* v. *Hoboken, etc., Co.* 18 How. 472; *James* v. *Reynolds*, 2 Tex. 251;) a present existing rule, and not an *ex post facto* law, (*Hoke* v. *Henderson*, 4 Dev. 15; *Taylor* v. *Porter*, 4 Hill, 146; *Wynehamer* v. *People*, 13 N. Y. 393; *Norman* v. *Horst*, 5 Watts & S. 171;) a law existing at the time of vesting of rights, (*Wilkinson* v. *Leland*, 2 Pet. 658; *Osborn* v. *Nicholson*, 13 Wall. 662.)

The fourteenth amendment does not employ the phrase "due process of law" in any new sense but as employed in the state constitution. *Munn* v. *Illinois*, 94 U. S. 118. The term, when applied to judicial procedure, means a course of legal procedure according to those rules and principles established by our jurisprudence for the protection and enforcement of private rights, (*Pennoyer* v. *Neff*, 95 U.S. 714,) and generally implies and includes parties, judge, regular allegations, and a trial according to some settled course of judicial proceedings, (*Murray* v. *Hoboken, etc., Co.* 18 How. 272; *Huber* v. *Reily*, 53 Pa. St. 112; *Rees* v. *Watertown*, 19 Wall. 122; *Westervelt* v. *Greg*, 12 N. Y. 202;) a timely and regular proceeding to judgment and execution, (*Dwight* v. *Williams*, 4 McLean, 586;) a legal proceeding under direction of a court (*Newcomb* v. *Smith*, 1 Chand. 71) intended to secure the right of trial according to the forms of law; (*Parsons* v. *Russell*, 11 Mich. 113.)

The phrase "due process of law" does not in all cases necessarily require judicial proceedings, (*McMillan* v. *Anderson*, 95 U. S. 37; see, to same effect, *Pearson* v. *Yewdall*, Id. 294; *Murray* v. *Hoboken, etc., Co.* 18 How. 272; *Davidson* v. *New Orleans*, 96 U. S. 897; *Greene* v. *Briggs*, 1 Curt. 311; *Murray* v. *Hoboken, etc., Co.* 18 How. 272; *Hoke* v. *Henderson*, 4 Dev. 15; *Taylor* v. *Porter*, 4 Hill, 146; *Van Zandt* v. *Waddel*, 2 Yerg. 260; *State Bank* v. *Cooper*, 2 Yerg. 599; *Jones* v. *Perry*, 10 Yerg. 59,) and does not necessarily import a trial by jury, (*Ex parte Meador*, 1 Abb. U. S. 317; *Petition of McMahon*, 22 N. Y. Daily Reg. 881;) but includes summary remedies, (*Martin* v. *Mott*, 12

Wheat. 19; *U. S.* v. *Ferreira,* 13 How. 40; *Murray* v. *Hoboken, etc., Co.* 18 How. 272.) A summary seizure of lands for non-payment may be authorized by state laws, and this is not a violation of the provision as to due process of law. *McMillan* v. *Anderson,* 95 U. S. 37. It simply requires that a person should be brought into court and have an opportunity to prove any fact for his protection. *People* v. *Essex Co.* 70 N. Y. 229. It implies the right of the person affected thereby to be present before the tribunal which pronounces judgment, to be heard by testimony or otherwise, and to have the right to controvert by proof any material facts which bear on the question of right; and if any question of fact or liability is conclusively presumed against him, it is not due process of law. *Zeigler* v. *S. & N. R. Co.* 58 Ala. 594; *Wilburn* v. *McCalley,* 63 Ala. 436. There must be a competent tribunal, and the party affected must be brought within the jurisdiction. *Pennoyer* v. *Neff,* 95 U. S. 714. It is a fundamental principle that before a person can be deprived of a right, even by judicial suit, he must have notice and reasonable opportunity to be heard in defense of his rights. *Gilmore* v. *Sapp,* 100 Ill. 297.

Although differing from proceedings in courts of justice the general system of procedure for the levy and collections of taxes, established in this country, is, within the meaning of the constitution, due process of law. *Kelly* v. *Pittsburgh,* 104 U. S. 78. The revenue laws of a state may be in harmony with the fourteenth amendment, which declares that no state shall deprive any person of life, liberty, or property without due process of law, although they do not provide that a person shall have an opportunity to be present when a tax is assessed against him, or that the tax shall be collected by suit. *McMillen* v. *Anderson,* 95 U. S. 37. A statute which gives a person against whom taxes are assessed a right to enjoin their collection, and have their validity judicially determined, is due process of law, notwithstanding he is required, as in other injunction cases, to give security in advance. *Id.* An act which makes ample provision for judicial inquiry in matters therein mentioned, is due process of law. *Pearson* v. *Yewdall,* 95 U. S. 294. A party is not deprived of his property without due process of law by the enforced collection of taxes, merely because they, in individual cases, work hardships or impose unequal burdens. *Kelly* v. *Pittsburgh,* 104 U. S. 78. It is a difficult attempt to give an authoritative definition of what it is for a state to deprive a person of his life, liberty, or property without due process of law, within the meaning of this amendment. The enunciation of the principles which govern each case as it arises is the better mode of arriving at a sound definition. *Davidson* v. *New Orleans,* 96 U. S. 97. Neither the unlimited power of a state to tax, nor any of its large police power, can be exercised to such an extent as to work a practical assumption of the power conferred by the constitution upon congress. *Railroad Co.* v. *Husen,* 95 U. S. 465.

PRIVILEGES AND IMMUNITIES OF CITIZENS. The first clause of the first section of the fourteenth amendment applies to the colored race, and its purpose is to establish the citizenship of the negro, and secure to the colored race the benefit of the freedom previously accorded to them. *Slaughter-house Cases,* 16 Wall. 36. The second clause protects from hostile legislation of the states the privileges and immunities of citizens of the United States, as distinguished from the privileges and immunities of citizens of the state. *Slaughter-*

*house Cases,* 16 Wall. 36; *Frasher* v. *State,* 3 Tex. Ct. App. 267. Whether the amendment had other, and if so, what purposes, not decided. *Strauder* v. *West Virginia,* 100 U. S. 303. A corporation created by and doing business in a particular state is to be deemed to all intents and purposes a person, although an artificial person, an inhabitant of the state, for the purposes of its incorporation, capable of being treated as a citizen of that state, as much as a natural person. *Louisville, etc., R. Co.* v. *Letson,* 2 How. 497. This decision put an end to the controversy on that point, and also put an end to what has long been felt, by the profession as well as the bench, to be an anomaly in our jurisprudence, (see *Greely* v. *Smith,* 3 Story, 76,) and is accepted as a precedent, (*Marshall* v. *Balt. & Ohio R. Co.* 16 How. 314; compare *Northern Ind. R. Co.* v. *Mich. Cent. R. Co.* 15 How. 223; *Lafayette Ins. Co.* v. *French,* 18 How. 404;) and as to a corporation being a citizen, it has been ever since adhered to, (*Covington Draw-bridge Co.* v. *Shephard,* 20 How. 227.) A corporation is deemed a "person" within the penal statutes as well as for civil purposes, (*U. S.* v. *Amedy,* 11 Wheat. 392;) within the statute of usury, (*Thornton* v. *Bank of Washington,* 3 Pet. 36;) within the treaty clause against confiscation and prosecution, (*Society for Prop. of Gosp.* v. *New Haven,* 8 Wheat. 464.)

So a corporation is deemed a citizen for the purposes of jurisdiction in the courts of the United States,—see Desty, Fed. Proc. (2d Ed.) § 629,—and as to the right of removal of a cause into the federal court, see Desty, Rem. Causes, § 10k. When the legislature provides for taxing the property of individuals, the constitution requires it to tax the property of corporations for pecuniary profit to the same extent and for the same purposes. *Mayor, etc., of Mobile* v. *Stonewall Ins. Co.* 53 Ala. 570; *City of Davenport* v. *C. I. & P. R. Co.* 38 Iowa, 633.

STATE POWER OF TAXATION. The power of taxation is an attribute of sovereignty of every government. *Transportation Co.* v. *Wheeling,* 99 U. S. 281. The power of the state to tax is an inherent and indispensable incident to sovereignty, (*Western U. Tel. Co.* v. *Mayer,* 28 Ohio St. 53; *Dobbins* v. *Com'rs,* 16 Pet. 435;) and exists independent of the constitution of the United States, (*McCulloch* v. *Maryland,* 4 Wheat. 316; *Lane Co.* v. *Oregon,* 9 Wall. 77; *Railroad Co.* v. *Peniston,* 18 Wall. 29; *Nathan* v. *Louisiana,* 8 How. 73; *People* v. *Coleman,* 4 Cal. 46.) By the revolution the powers of government devolved upon the people of the United States. *McCulloch* v. *Maryland,* 4 Wheat. 316; *Dartmouth College* v. *Woodward,* 4 Wheat. 518; *Green* v. *Biddle,* 8 Wheat. 1; *Ogden* v. *Saunders,* 12 Wheat. 213; *Cherokee Nation* v. *Georgia,* 3 Wall. 585. The power is supreme unless the subject be beyond the borders of the state, or the property within the state has been ceded to the United States, and within its separate and exclusive jurisdiction; and this supremacy cannot be questioned by the judiciary. See Desty, Fed. Const. 59, and cases cited. The power to tax *all* property within the jurisdiction, does not include public property; the word "all" in the state constitution applies only to private property. *People* v. *Doe G.* 36 Cal. 220. Except as restricted by the constitution, the state has full power of taxation over all subjects, (Id. note 5;) and to every object of value, except as restricted by the constitutional provisions as to the means and instrumentalities for carrying out the powers of government, and such as are neces-

sarily implied as falling within the category of such means and instruments, (*Day* v. *Buffington*, 3 Cliff. 387; *Transportation Co.* v. *Wheeling*, 99 U. S. 279; *Savings Society* v. *Coite*, 6 Wall. 604; *State Tonnage Tax Cases*, 12 Wall. 204;) such as national banks; (*McCulloch* v. *Maryland*, 4 Wheat. 316; *Osborn* v. *Bank*, 9 Wheat. 860; *National Coml. Bank* v. *Mobile*, 62 Ala. 284; *Hills* v. *Nat. Alb. Exch. Bank*, 12 Fed. Rep. 95; *Evansville Nat. Bank* v. *Britton*, 25 Alb. L. J. 432; *Bank Tax Case*, 2 Wall. 200; *Farmers' Nat. Bank* v. *Dearing*, 91 U. S. 29;) or United States bonds; (*Bank of Commerce* v. *New York*, 2 Black, 620; *Bank Tax Case*, 2 Wall. 200; *Chicago* v. *Lamb*, 52 Ill. 414; *Bank of Kentucky* v. *Com'rs*, 9 Bush, 46; *Op. Just.* 53 N. H. 634;) or treasury notes or other government securities; (*The Banks* v. *Mayor*, 7 Wall. 16; *Bank* v. *Sup'rs*, Id. 28; *Montgomery Co.* v. *Elston*, 32 Ind. 27; *State* v. *Haight*, 37 N. J. Law, 128; Desty, Fed. Const. 63;) or government revenue stamps; (*Palfrey* v. *Boston*, 101 Mass. 329;) or money in the treasury; or precious metals in the mint; or the lots, structures, ships, materials of war, or other property devoted to the public purposes of the United States, (*City* v. *Churchill*, 33 N. Y. 693; S. C. 43 Barb. 550,) situated within its limits, (*Anon.* 9 Op. Atty. Gen. 291.) These exemptions depend upon the effect of the tax,—whether it will hinder the efficient exercise of the powers of the government, (*Railroad Co.* v. *Peniston*, 18 Wall. 5; *Nat. Bank* v. *Com'r*, 9 Wall. 353; *Dobbins* v. *Com'rs*, 16 Pet. 435; *Waite* v. *Dowley*, 9 Chi. Leg. News, 263;) but do not apply where a tax only remotely affects its exercise, (*Railroad Co.* v. *Peniston*, 18 Wall. 5;) so a railroad company was held not exempt from state taxation, as being a means or instrument employed by the national government for the transportation of the mails, arms, and munitions of war of the United States. *Huntington* v. *Cent. Pac. R. Co.* 2 Sawy. 503. See *State Bank Tax Cases*, 92 U. S. 595.

EQUALITY AND UNIFORMITY OF TAXATION. The provision of the constitution of the United States, art. 1, § 8, subd. 1, was designed to secure uniformity as between the states, not as between different kinds of property; in the language of Judge Story, "to cut off all undue preferences of one state over another in the regulation of subjects affecting their common interests." And the object of the state constitutions was to secure the same equality as between different kinds of taxable property that the other designed to secure as between the states. And this can only be attained by a uniform rule. *State* v. *Winnebago Lake & F. R. P. Co.* 11 Wis. 42; *Exchange Bank* v. *Hines*, 3 Ohio St. 1. See *Western Union Tel. Co.* v. *Mayer*, 28 Ohio St. 592; *Waring* v. *Savannah*, 60 Ga. 93; *Marsh* v. *Clark Co.* 42 Wis. 502. The object of such constitutional provisions is to regulate the powers of taxation by such limitations and restrictions as will protect against unjust or arbitrary action. *West. U. Tel. Co.* v. *Mayer*, 28 Ohio St. 533. See *McCulloch* v. *Maryland*, 4 Wheat. 316; *Providence Bank* v. *Billings*, 4 Pet. 519; *North. M. R. R.* v. *McGuire*, 20 Wall. 46. To be uniform, taxation need not be universal. Certain objects may be made its subjects and others be exempted, but as between subjects of the same class there must be equality. *New Orleans* v. *Fourchy*, 30 La. Ann. 910; *State* v. *Poydras*, 9 La. Ann. 165. The legislature has the power to prescribe not only the property to be taxed, but the rule by

which it must be taxed, and the only limitation of that power is that the rule shall be uniform. *Wisconsin Cent. R. Co.* v. *Taylor Co.* 52 Wis. 37, 43, and cases cited. Uniformity means that all kinds of property not absolutely exempt must be taxed alike by the same standard of valuation equally with other taxable property, and co-extensively with the territory to which it applies. *Gilman* v. *Sheboygan*, 2 Black, 510. They must be uniform in respect to persons and property within the jurisdiction of the body imposing the same, (*Hanscom* v. *Omaha*, 11 Neb. 37,) and all property of any particular class must be taxed alike. *Wisconsin Cent. R. Co.* v. *Taylor Co.* 52 Wis. 43, and cases cited; *Home Ins. Co.* v. *Augusta*, 50 Ga. 543. It is uniform when it is equal upon all persons belonging to the described class upon which it is imposed. *Gatlin* v. *Town of Tarboro*, 78 N. C. 119. To render taxes uniform it is essential that the tax district should confine itself to objects of taxation within its limits, but this with the understanding that the *situs* of personal property may be the domicile of the owner. *Barton* v. *Kalloch*, 56 Cal. 95; *People* v. *Townsend*, 56 Cal. 633; *People* v. *Placerville*, 34 Cal. 656.

The constitutions of some of the states, in terms or by necessary implication, require all private property to be taxed in proportion to its value. *O'Kane* v. *Treat*, 25 Ill. 557; *Mobile* v. *Dargan*, 45 Ala. 310; *Mobile* v. *Street Ry. Co.* Id. 322; *Washington* v. *State*, 13 Ark. 752; *McGehee* v. *Mathis*, 24 Ark. 40. The constitution of Kansas differs from the constitution of other states, requiring only a uniform "rate" of taxation and not requiring *all* property except that which is exempt to be taxed by a uniform rule; hence railroad property in that state may be assessed in one manner and other property in a different manner, and personal property be assessed on different rules, and still all the assessments be held valid. *Com'rs of Ottawa* v. *Nelson*, 19 Kan. 238; *Gulf R. Co.* v. *Morris*, 7 Kan. 210. The constitution of California, art. 13, § 1, providing that all property in the state, not exempted under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, requires that the assessor shall proceed to ascertain such value in the manner provided by law. *Hyatt* v. *Allen*, 54 Cal. 353. And the provisions requiring that all taxes shall be uniform on the same class of subjects within the territorial authority levying the tax, is merely declaratory of the law before the adoption of the new constitution. *Kitty Roup's Case*, 81\* Pa. St. 211. Where the constitution requires that the valuation must be uniform, and in all cases alike and equal, and the legislature prescribes a different rule, the act is a departure from the constitution and void. *Knowlton* v. *Sup'rs Rock Co.* 9 Wis. 410. Equality of taxation means apportioning the contributions of each person towards the expenses of government so that he shall feel neither more nor less inconvenience from his share of the payment than every other person experiences. *Kirby* v. *Shaw*, 19 Pa. St. 258. Perfectly equal taxation is perhaps unattainable, (*Grim* v. *School-dist.* 57 Pa. St. 433;) it can never be but approximation, (*Allen* v. *Drew*, 44 Vt. 174;) as from the nature of the case there can be no uniform rule for making the assessments, (*Coite* v. *Soc. for Savings*, 32 Conn. 173;) and for that reason equality of taxation is not enforced by the bill of rights, (*Kirby* v. *Shaw*, 19 Pa. St. 258;) but where a moral obligation exists the legislature may give it legal effect, (*Lycoming* v. *Union*, 15 Pa. St. 166.)

UNJUST DISCRIMINATIONS. The principle of equality running through our constitutional system does not admit of discrimination in behalf of one citizen to the detriment of another. *Mason* v. *Trustees*, 4 Bush, 408. Taxes should be regulated by fixed general rules, and be apportioned by law according to a uniform ratio of equality, (*Sutton* v. *Louisville*, 5 Dana, 28; *Woodbridge* v. *Detroit*, 8 Mich. 274; *Grim* v. *School-dist.* 57 Pa. St. 433; *Knowlton* v. *Rock County*, 9 Wis. 410;) the object being protection of the tax-payer against discriminating exactions, (*Lexington* v. *McQuillan*, 9 Dana, 513.) The constitution of Illinois precludes discrimination against classes of persons or property, (*Primm* v. *Belleville*, 59 Ill. 142,) and against railroad property, (*Bureau County* v. *Chicago, etc., R. Co.* 44 Ill. 229; *Chicago, etc., R. Co.* v. *Boone County*, Id. 240.) Restrictions may be necessary to prevent abuses which may not amount to a violation of the rule of uniformity. There may be *uniform* abuses of the taxing power by reckless and improvident management on the part of local authorities, and the provisions of the constitution requiring the legislature, in establishing municipal corporations, to restrict their powers of taxation so as to prevent abuses, etc., is designed to give further protection in addition to that furnished by the rule of uniformity. *Weeks* v. *Milwaukee*, 10 Wis. 242. . When the inequality of valuation is the result of a statute of the state, designed to discriminate injuriously against any classes of persons or species of property, the court will grant appropriate relief. *People* v. *Weaver*, 100 U. S. 539; *Fulton* v. *National Bank*, 101 U. S. 143; *Cumming* v. *National Bank*, Id. 153; *National Bank* v. *Kimball*, 2 Morr. Trans. 463. A statute in derogation of the rights of property, or which takes away the estate of the citizen, must be strictly construed, (*Sharp* v. *Spier*, 4 Hill, 76; *Bloom* v. *Burdick*, 1 Hill, 130;) but courts will not interfere on the ground that the tax is unfair or unjust, unless the fundamental law of the land has been violated. *Linton* v. *Mayor of Athens*, 53 Ga. 588; *Cleghorn* v. *Postlewaite*, 43 Ill. 428; *Darling* v. *Gunn*, 50 Ill. 424. See *Second Nat. Bank* v. *Caldwell*, *ante*, 429, and note. Where a law is unconstitutional courts will hold it void, but upon no other ground can it be disregarded. *P., C. & St. L. Ry. Co.* v. *Brown*, 77 Ind. 45. So, where statutes impose taxes on false and unjust principles, or operate to produce gross inequality, courts may interpose and declare such enactments void. *Com.* v. *Savings Bank*, 5 Allen, 428. See *Lowell* v. *Oliver*, 8 Allen, 247; *Ould* v. *Richmond*, 23 Grat. 464; *Howell* v. *Bristol*, 8 Bush, 493. But they cannot afford relief from the enforcement of laws prescribing modes and subjects of taxation if they neither trench upon the federal authority nor violate any right secured by the constitution. *Kirtland* v. *Hotchkiss*, 100 U. S. 491. Courts ought not to declare a law void without a strong and earnest conviction, divested of all reasonable doubt, of its invalidity. *Chicago, D. & V. R. Co.* v. *Smith*, 62 Ill. 268; *Lane* v. *Dotman*, 4 Ill. 238; *People* v. *Marshall*, 6 Ill. 672.

An act which fixes absolute liability in a corporation, and which does not provide "due process of law," is in violation of the bill of rights. *Zeigler* v. *S. & N. R. Co.* 58 Ala. 594. See *Plumer* v. *Marathon County*, 46 Wis. 163. A statute which attempts to make an assessment conclusive evidence of the amount due for taxes is invalid. *Plumer* v. *Marathon Co.* 46 Wis. 163. Where a statute establishes a rule for the estimation of the value of railroad

property for taxation which is in contravention of the constitution, the assessment of taxes made in obedience thereto is invalid. *Board of Assessors* v. *Ala. Cent. R. Co.* 59 Ala. 551. A statute which permits deductions for indebtedness to be made from the assessed value of property does not operate to render taxation unequal. *Wetmore* v. *Multnomah Co.* 6 Or. 463. Where debts existed which ought to have been deducted, but were not deducted, the assessment was held voidable but not void, the assessors being entitled to notice of the existence of debts which he was entitled to have deducted. *Supervisors* v. *Stanley,* 12 FED. REP. 82. That they are totally void, see same case, dissenting opinion of *Bradley,* J., p. 91. An act of the legislature which refuses to the shareholders of a national bank the same deduction for debts due by him from his shares of stock that it allows to others who have moneyed capital otherwise invested, is in conflict with the act of congress permitting shares of national banks to be taxed. *Williams* v. *Weaver,* 100 U. S. 539; and see *Ruggles* v. *Fond du Lac,* 53 Wis. 436; *People* v. *Weaver,* 100 U. S. 539; *People* v. *Dolan,* 36 N. Y. 59; *Ankeny* v. *Multnomah Co.* 4 Or. 271; S. C. 3 Or. 386; *Pelton* v. *National Bank,* 101 U. S. 143. That a suit to enjoin the collection of a tax under such an act may be enjoined, see *Hills* v. *Nat. Alb. Exch. Bank,* 12 FED. REP. 93; and see *Second Nat. Bank* v. *Caldwell, ante,* 429, and note.

JOURNALS OF THE LEGISLATURE AS EVIDENCE. By the provisions of the state constitution a bill must be read at length on three separate days in each house, unless, in case of urgency, two-thirds of the house, by a vote taken by yeas and nays, dispense with the provisions either as to the manner of reading or the reading on separate days. *Weill* v. *Kenfield,* 54 Cal. 111. That the journals of the legislature may be examined to ascertain that a bill was constitutionally passed, see *Walnut* v. *Wade,* 103 U. S. 683; *Perry County* v. *Railroad Co.* 58 Ala. 546; *Harrison* v. *Goody,* 57 Ala. 49; *Walker* v. *Griffith,* 60 Ala. 361.—[ED.